**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC. and ENERGY INTELLIGENCE GROUP (UK) LIMITED,<br><br>        Plaintiffs,<br>                    v.<br><br>EXELON GENERATION CO.,<br><br>        Defendant. | Civil Action No. 20-cv-03983<br><br>Honorable Joan B. Gottschall<br><br>JURY TRIAL DEMANDED |

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
TO PLAINTIFFS' COMPLAINT FOR COPYRIGHT INFRINGEMENT**

Defendant Exelon Generation Company, LLC ("Exelon"), named as Exelon Generation Co. by Plaintiffs, by and through its undersigned attorneys, submits the following Answer, Affirmative Defenses, and Counterclaims to the Complaint for Copyright Infringement filed by Plaintiffs Energy Intelligence Group, Inc. ("EIG") and Energy Intelligence Group (UK) Limited ("EIG UK") (collectively, "Plaintiffs"):

## **INTRODUCTION**

1.      Plaintiffs bring this action against Defendant under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act") for willful infringement of Plaintiffs' registered copyrights.

1

**ANSWER**: Exelon admits that Plaintiffs are seeking the specified relief under the stated statute. Exelon denies that Plaintiffs' rights have been violated and denies that Plaintiffs are entitled to any relief.

## THE PARTIES

2. Plaintiff EIG is a Delaware corporation with its principal place of business located at 270 Madison Avenue, Suite 302, New York, New York 10016.

**ANSWER**: Admitted on information and belief.

3. Plaintiff EIG UK is a United Kingdom limited company with its principal place of business located at Interpark House, 7 Down Street, London, W1J 7AJ United Kingdom.

**ANSWER**: Admitted on information and belief.

4. Upon information and belief, Defendant Exelon Generation Co., is a Pennsylvania corporation with a place of business at 4300 Winfield Road, Warrenville, Illinois 60555.

**ANSWER**: Exelon denies that its full name is "Exelon Generation Co." and denies that it is a corporation. Exelon admits that it is a Pennsylvania limited liability company with a place of business at 4300 Winfield Road, Warrenville, Illinois 60555.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over causes of action alleging copyright infringement pursuant to Sections 501, *et seq.* of the Copyright Act. Additionally, the Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because the federal courts are vested with exclusive jurisdiction in copyright cases. 28 U.S.C. § 1338(a).

**ANSWER**: Admitted.

6. This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant is present and doing business in this District, and the acts of copyright infringement alleged herein took place in this District.

**ANSWER**: Exelon denies that it committed any acts of copyright infringement. Exelon admits that this Court has personal jurisdiction over Exelon in this action.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a).

**ANSWER**: Exelon does not contest venue in this action.

## FACTUAL BACKGROUND

### A. Plaintiffs' Publications

8. Plaintiffs, and their predecessors-in-interest, have been engaged in publishing newsletters and other publications for the highly-specialized global energy industry for nearly seventy years. In particular, Plaintiffs and their predecessors-in-interest have published the weekly newsletter *Nuclear Intelligence Weekly* ("NIW") since 2011. A representative copy of the March 15, 2019 issue of NIW is attached hereto as Exhibit A (the "March 15, 2019 Registered NIW Work").

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests have been publishing the weekly newsletter *Nuclear Intelligence Weekly* since at least 2011, and that a copy of NIW is attached to the Complaint as Exhibit A. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 and therefore denies the same.

9. The audience for Plaintiffs' publications, including NIW, consists of individuals with an interest in the global energy and power industries, including securities brokers and dealers, consultants, bankers, investors, stock market analysts, traders, commodity analysts,

and others who follow or work in these industries or sell goods and services to those in or following these industries.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and therefore denies the same.

10.     Plaintiffs' focus is on providing original, high-quality articles and analysis relating to the nuclear power, natural gas and related industries through NIW and their other publications. Plaintiffs have invested significant time and resources to create their publications, including NIW.

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests publish the weekly newsletter *Nuclear Intelligence Weekly.* Further answering, Exelon states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Exelon has only recently become aware, Plaintiffs' business model is actually predicated on luring customers into subscription agreements, entrapping them in copyright lawsuits, and then extorting massive settlements that have no relationship to the actual value of Plaintiffs' publications.  Exelon denies the remaining allegations in Paragraph 10.

11.     Plaintiffs' publications do not feature or have any advertisements or sponsors in order to ensure journalistic integrity and objective reporting. Plaintiffs are, therefore, dependent on paid subscriptions to sustain the viability of their publications.

**ANSWER**: Admitted on information and belief that the weekly newsletter *Nuclear Intelligence Weekly* does not contain advertisements.  Exelon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first

sentence of Paragraph 11, and therefore denies the same. Further answering, Exelon states that

Plaintiffs purport to be engaged in publishing informational newsletters for the global energy

industry but, as Exelon has only recently become aware, Plaintiffs' business model is actually

predicated on luring customers into subscription agreements, entrapping them in copyright

lawsuits, and then extorting massive settlements that have no relationship to the actual value

of Plaintiffs' publications. Exelon denies the remaining allegations of Paragraph 11.

12. Plaintiffs maintain an experienced and knowledgeable editorial staff of approximately sixty (60) reporters, editors, and analysts at seven (7) editorial bureaus located in New York, Washington, D.C., Houston, London, Moscow, Dubai, and Singapore.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 12 and therefore denies the same.

13. The copyrighted, original content and analysis created by Plaintiffs included in their publications are valuable copyrighted works and publication assets of Plaintiffs. In addition to NIW, Plaintiffs also publish other original publications, including, but not limited to:

EI Finance;
EI New Energy;
EI New Energy Data Source;
Energy Compass;
Energy Intelligence Briefing;
International Oil Daily;
Jet Fuel Intelligence;
LNG Intelligence;
Natural Gas Week Data Source;
NGW's Gas Market Reconnaissance;
Nefte Compass;
Nefte Compass Data Source;
Oil Daily;
Oil Market Intelligence;
Oil Market Intelligence Data Source;
Petroleum Intelligence Weekly;

Petroleum Intelligence Weekly Data Source; and
World Gas Intelligence Data Source.

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests publish the weekly newsletter *Nuclear Intelligence Weekly* ("NIW") and have obtained registered copyrights for at least some NIW works.  Further answering, Exelon states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Exelon has only recently become aware, Plaintiffs' business model is actually predicated on luring customers into subscription agreements, entrapping them in copyright lawsuits, and then extorting massive settlements that have no relationship to the actual value of Plaintiffs' publications.  Exelon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13 and therefore denies the same.

14.     Plaintiffs have developed an exemplary reputation for their high journalistic standards and the reliability of the content of all their publications, including the EIG Publications.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and therefore denies the same.

15.     In order for third parties to regularly benefit from Plaintiffs' analytical and creative content contained in NIW and Plaintiffs' other publications, Plaintiffs offer various subscriptions to interested parties to access the valuable content contained therein.

**ANSWER**: Admitted that Plaintiffs offer subscriptions to *Nuclear Intelligence Weekly*. Exelon is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 15 and therefore denies the same. Further answering, Exelon states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Exelon has only recently become aware, Plaintiffs' business model is actually predicated on luring customers into subscription agreements, entrapping them in copyright lawsuits, and then extorting massive settlements that have no relationship to the actual value of Plaintiffs' publications.

16. Interested parties have various subscription options depending on their respective needs. Subscribers typically obtain NIW and Plaintiffs' other publications by email and/or from Plaintiffs' website, which permits password-protected access to archived and/or current issues, pursuant to a subscription or license agreement. Plaintiffs' website also provides the individual articles in Plaintiffs' publications separately from the publication.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and therefore denies the same.

17. Interested parties that do not maintain a subscription or license agreement may also purchase individual articles appearing in NIW and Plaintiffs' other publications, as well as archived articles, by using Plaintiffs' pay-per-article service. The license fee per article, per copy, is $24.00 for articles appearing in NIW. The total license fee for this pay-per-article service is the per-article price multiplied by the number of copies of the requested article.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and therefore denies the same.

18. Interested parties that do not maintain a subscription or license agreement may also purchase individual issues of NIW including EIG Publications, as well as archived issues, from Plaintiffs using Plaintiffs' pay-per-issue service. The license fee per issue, per copy, is

$395.00 for NIW. The total license fee for this pay-per-issue service is the per-issue price multiplied by the number of copies of the requested issue.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore denies the same.

## B.  **Plaintiffs' NIW Copyrights**

19.     Plaintiffs are the exclusive copyright owners in, and to, numerous original works of authorship including, without limitation, the issues of the Registered NIW Works and the articles which are contained therein and independently available.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore denies the same.

20.     Among other copyright registrations, Plaintiffs are the owners of the following U.S. Copyright Registrations for the following issues of NIW (hereinafter collectively referred to as the "Registered NIW Works"), attached hereto as Exhibit B:

- No. TX 7-617-881 for Volume 5 covering 4 collective works and the articles contained therein published in November 2011;

- No. TX 7-617-865 for Volume 5 covering 3 collective works and the articles contained therein published in December 2011;

- No. TX 7-616-146 for Volume 6 covering 5 collective works and the articles contained therein published in January 2012;

- No. TX 7-616-133 for Volume 6 covering 3 collective works and the articles contained therein published in February 2012;

- No. TX 7-574-386 for Volume 6 covering 5 collective works and the articles contained therein published in March 2012;

- No. TX 7-625-294 for Volume 6 covering 4 collective works and the articles contained therein published in April 2012;

- No. TX 7-630-804 for Volume 6 covering 4 collective works and the articles contained therein published in May 2012;

- No. TX 7-633-342 for Volume 6 covering 5 collective works and the articles contained therein published in June 2012;

- No. TX 7-660-942 for Volume 6 covering 4 collective works and the articles contained therein published in July 2012;

- No. TX 7-615-855 for Volume 6 covering 5 collective works and the articles contained therein published in August 2012;

- No. TX 7-614-525 for Volume 6 covering 4 collective works and the articles contained therein published in September 2012;

- No. TX0 8-054-637 for Volume 6 covering 4 collective works and the articles contained therein published in October 2012;

- No. TX0 8-054-644 for Volume 6 covering 5 collective works and the articles contained therein published in November 2012;

- No. TX 7-688-976 for Volume 6 covering 3 collective works and the articles contained therein published in December 2012;

- No. TX 7-690-160 for Volume 7 covering 4 collective works and the articles contained therein published in January 2013;

- No. TX 7-707-508 for Volume 7 covering 4 collective works and the articles contained therein published in February 2013;

- No. TX 7-710-852 for Volume 7 covering 5 collective works and the articles contained therein published in March 2013;

- No. TX 7-729-286 for Volume 7 covering 4 collective works and the articles contained therein published in April 2013;

- No. TX 7-732-033 for Volume 7 covering 5 collective works and the articles contained therein published in May 2013;

- No. TX 7-731-757 for Volume 7 covering 4 collective works and the articles contained therein published in June 2013;

- No. TX 7-759-281 for Volume 7 covering 4 collective works and the articles contained therein published in July 2013;

- No. TX 7-759-211 for Volume 7 covering 5 collective works and the articles contained therein published in August 2013;

- No. TX 7-893-781 for Volume 7 covering 4 collective works and the articles contained therein published in September 2013;

- No. TX 7-808-554 for Volume 7 covering 4 collective works and the articles contained therein published in October 2013;

- No. TX 7-954-985 for Volume 7 covering 4 collective works and the articles contained therein published in November 2013;

- No. TX 7-808-956 for Volume 7 covering 4 collective works and the articles contained therein published in December 2013;

- No. TX 7-875-053 for Volume 8 covering 5 collective works and the articles contained therein published in January 2014;

- No. TX 7-891-016 for Volume 8 covering 4 collective works and the articles contained therein published in February 2014;

- No. TX 7-927-119 for Volume 8 covering 4 collective works and the articles contained therein published in March 2014;

- No. TX 7-891-074 for Volume 8 covering 4 collective works and the articles contained therein published in April 2014;

- No. TX 7-941-640 for Volume 8 covering 5 collective works and the articles contained therein published in May 2014;

- No. TX 7-942-610 for Volume 8 covering 4 collective works and the articles contained therein published in June 2014;

- No. TX 7-934-520 for Volume 8 covering 4 collective works and the articles contained therein published in July 2014;

- No. TX 7-943-778 for Volume 8 covering 5 collective works and the articles contained therein published in August 2014;

- No. TX 7-958-698 for Volume 8 covering 4 collective works and the articles contained therein published in September 2014;

- No. TX 8-060-069 for Volume 8 covering 5 collective works and the articles contained therein published in October 2014;

- No. TX0 7-985-559 for Volume 8 covering 3 collective works and the articles contained therein published in November 2014;

- No. TX0 7-993-971 for Volume 8 covering 4 collective works and the articles contained therein published in December 2014;

- No. TX 8-445-113 for Volume 9 covering 5 collective works and the articles contained therein published in January 2015;

- No. TX 8-445-115 for Volume 9 covering 4 collective works and the articles contained therein published in February 2015;

- No. TX 8-445-119 for Volume 9 covering 4 collective works and the articles contained therein published in March 2015;

- No. TX 8-150-414 for Volume 9 covering 4 collective works and the articles contained therein published in April 2015;

- No. TX 8-210-772 for Volume 9 covering 5 collective works and the articles contained therein published in May 2015;

- No. TX 8-137-601 for Volume 9 covering 4 collective works and the articles contained therein published in June 2015;

- No. TX 8-164-011 for Volume 9 covering 5 collective works and the articles contained therein published in July 2015;

- No. TX 8-169-888 for Volume 9 covering 4 collective works and the articles contained therein published in August 2015;

- No. TX 8-170-154 for Volume 9 covering 4 collective works and the articles contained therein published in September 2015;

- No. TX 8-276-193 for Volume 9 covering 5 collective works and the articles contained therein published in October 2015;

- No. TX 8-274-825 for Volume 9 covering 4 collective works and the articles contained therein published in November 2015;

- No. TX 8-272-374 for Volume 9 covering 4 collective works and the articles contained therein published in December 2015;

- No. TX 8-228-020 for Volume 10 covering 4 collective works and the articles contained therein published in January 2016;

- No. TX 8-228-0038 for Volume 10 covering 4 collective works and the articles contained therein published in February 2016

- No. TX 8-277-773 for Volume 10 covering 4 collective works and the articles contained therein published in March 2016;

- No. TX 8-344-122 for Volume 10 covering 5 collective works and the articles contained therein published in April 2016;

- No. TX 8-285-228 for Volume 10 covering 4 collective works and the articles contained therein published in May 2016;

- No. TX 8-350-358 for Volume 10 covering 4 collective works and the articles contained therein published in June 2016;

- No. TX 8-327-965 for Volume 10 covering 5 collective works and the articles contained therein published in July 2016;

- No. TX 8-371-316 for Volume 10 covering 4 collective works and the articles contained therein published in August 2016;

- No. TX 8-341-785 for Volume 10 covering 5 collective works and the articles contained therein published in September 2016;

- No. TX 8-372-970 for Volume 10 covering 4 collective works and the articles contained therein published in October 2016;

- No. TX 8-351-630 for Volume 10 covering 4 collective works and the articles contained therein published in November 2016;

- No. TX 8-371-839 for Volume 10 covering 4 collective works and the articles contained therein published in December 2016;

- No. TX 8-389-221 for Volume 11 covering 4 collective works and the articles contained therein published in January 2017;

- No. TX 8-389-133 for Volume 11 covering 4 collective works and the articles contained therein published in February 2017;

- No. TX 8-384-884 for Volume 11 covering 5 collective works and the articles contained therein published in March 2017;

- No. TX 8-384-928 for Volume 11 covering 4 collective works and the articles contained therein published in April 2017;

12

- No. TX 8-430-673 for Volume 11 covering 4 collective works and the articles contained therein published in May 2017;

- No. TX 8-431-910 for Volume 11 covering 5 collective works and the articles contained therein published in June 2017;

- No. TX 8-430-385 for Volume 11 covering 4 collective works and the articles contained therein published in July 2017;

- No. TX 8-442-977 for Volume 11 covering 4 collective works and the articles contained therein published in August 2017;

- No. TX 8-442-939 for Volume 11 covering 5 collective works and the articles contained therein published in September 2017;

- No. TX 8-471-682 for Volume 11 covering 4 collective works and the articles contained therein published in October 2017;

- No. TX 8-506-109 for Volume 11 covering 4 collective works and the articles contained therein published in November 2017;

- No. TX 8-790-917 for Volume 11 covering 4 collective works and the articles contained therein published in December 2017;

- No. TX 8-675-970 for Volume 12 covering 3 collective works and the articles contained therein published in January 2018;

- No. TX 8-572-881 for Volume 12 covering 4 collective works and the articles contained therein published in February 2018;

- No. TX 8-582-274 for Volume 12 covering 4 collective works and the articles contained therein published in March 2018;

- No. TX 8-596-384 for Volume 12 covering 5 collective works and the articles contained therein published in April 2018;

- No. TX 8-598.961 for Volume 12 covering 4 collective works and the articles contained therein published in May 2018;

- No. TX 8-719-892 for Volume 12 covering 5 collective works and the articles contained therein published in June 2018;

- No. TX 8-681-652 for Volume 12 covering 4 collective works and the articles contained therein published in July 2018;

- No. TX 8-681-637 for Volume 12 covering 5 collective works and the articles contained therein published in August 2018;

- No. TX 8-664-307 for Volume 12 covering 4 collective works and the articles contained therein published in September 2018;

- No. TX 8-731-124 for Volume 12 covering 4 collective works and the articles contained therein published in October 2018;

- No. TX 8-694-333 for Volume 12 covering 4 collective works and the articles contained therein published in November 2018;

- No. TX 8-753-548 for Volume 12 covering 3 collective works and the articles contained therein published in December 2018;

- No. TX 8-748-786 for Volume 13 covering 4 collective works and the articles contained therein published in January 2019;

- No. TX 8-748-854 for Volume 13 covering 4 collective works and the articles contained therein published in February 2019;

- No. TX 8-758-134 for Volume 13 covering 5 collective works and the articles contained therein published in March 2019;

- No. TX 8-714-974 for Volume 13 covering 4 collective works and the articles contained therein published in April 2019;

- No. TX 8-807-598 for Volume 13 covering 5 collective works and the articles contained therein published in May 2019;

- No. TX 8-815-920 for Volume 13 covering 4 collective works and the articles contained therein published in June 2019;

- No. TX 8-821-888 for Volume 13 covering 4 collective works and the articles contained therein published in July 2019;

- No. TX 8-846-342 for Volume 13 covering 5 collective works and the articles contained therein published in August 2019;

- No. TX 8-838-978 for Volume 13 covering 4 collective works and the articles contained therein published in September 2019;

- No. TX 8-841-389 for Volume 13 covering 4 collective works and the articles contained therein published in October 2019;

- No. TX 8-842-665 for Volume 13 covering 4 collective works and the articles contained therein published in November 2019;

- No. TX 8-839-002 for Volume 13 covering 4 collective works and the articles contained therein published in December 2019;

- No. TX 8-858-939 for Volume 14 covering 5 collective works and the articles contained therein published in January 2020;

- No. TX 8-858-749 for Volume 14 covering 4 collective works and the articles contained therein published in February 2020;

- No. TX 8-874-913 for Volume 14 covering 4 collective works and the articles contained therein published in March 2020; and

- No. TX 8-876-561 for Volume 14 covering 4 collective works and the articles contained therein published in April 2020.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies the same.

## C. <u>The NIW Copyright Notices</u>

21. Plaintiffs have complied with the laws pertinent to providing notice of Plaintiffs' copyrights in, and to, the NIW Publications and their other publications. Specifically, Plaintiffs provide copyright notices and warnings on their website, e-mails, articles and publications, including the NIW Publications, so that third parties are aware of Plaintiffs' rights in their publications and works of original authorship (the "Copyright Notice and Warnings"). As a representative example, the Copyright Notice and Warnings contained in the e-mail transmitting the March 15, 2019 Registered NIW Work state:

Copyright © 2019 Energy Intelligence Group, Inc. All rights reserved.

Reproduction or distribution internally or externally in any manner (photostatically, electronically, or via facsimile), including by sharing printed copies, or forwarding or posting on local- and wide-area networks and intranets, or sharing user name and password, is strictly prohibited without appropriate license from Energy Intelligence – Contact customerservice@energyintel.com for more information.

(Exhibit C).

**ANSWER**: Paragraph 21 states a legal conclusion as to which no response is required. To the extent a response it required, Exelon admits that Paragraph 21 quotes certain text that appears in Exhibit C to the Complaint, but it is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 21 and therefore denies the same.

22.     As an additional representative example, the Copyright Notice and Warnings on the front cover of the March 15, 2019 Registered NIW Work specifically state: "Copyright © 2019 Energy Intelligence Group. All rights reserved. Unauthorized access or electronic forwarding, even for internal use, is prohibited." (Exhibit A at 1).

**ANSWER**: Exelon admits that Paragraph 22 quotes certain text that appears on page 1 of Exhibit A to the Complaint.  Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 22 and therefore denies the same.

23.     As a further representative example, Plaintiffs also use the following Copyright Notice and Warnings in NIW:

> Copyright © 2019 by Energy Intelligence Group, Inc. [. . .] All rights reserved. Access, distribution and reproduction are subject to the terms and conditions of the subscription agreement and/or license with Energy Intelligence. Access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with Energy Intelligence is willful copyright infringement. Additional copies of individual articles may be obtained using the pay-per-article feature offered at www.energyintel.com.

(Exhibit A at 10).

**ANSWER**: Exelon admits that Paragraph 23 quotes certain text that appears on page 10 of Exhibit A to the Complaint. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 23 and therefore denies the same.

24. Based on these representative examples of the Copyright Notice and Warnings set forth in the NIW Publications, Plaintiffs are in compliance with the copyright notice requirements set forth in the Copyright Act, 17 U.S.C. § 401.

**ANSWER**: Paragraph 24 states a legal conclusion as to which no response is required. To the extent a response it required, Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies the same.

25. Accordingly, Defendant knew or should have known that the March 15, 2019 Registered NIW Work and all other issues of the NIW Publications received by the Defendant and the articles contained therein were and are protected by U.S. copyright laws.

**ANSWER**: Denied.

26. The copyright notices appearing conspicuously on multiple materials received by the Defendant, including the NIW Publications, demonstrate Defendant's actual notice of Plaintiffs' copyrights in the Registered NIW Works received by the Defendant and the articles contained therein, all of which are protected by U.S. copyright laws.

**ANSWER**: Denied.

27. Defendant had constructive knowledge of Plaintiffs' copyrights in the Registered NIW Works based on receiving the Registered NIW Works containing the copyright notices prominently displayed in each of the NIW Publications.

**ANSWER**: Denied.

28. Having complied with the copyright notice requirements set forth in the Copyright Act, 17 U.S.C. § 401, Plaintiffs have provided Defendant with complete and proper notice of Plaintiffs' copyrights in the Registered NIW Works.

**ANSWER**: Denied.

### D. <u>Defendant's NIW Subscription History</u>

29. From at least as early as November 2011 through the present, Defendant has maintained a subscription for two of its employees to each receive a single-copy of NIW and the articles therein by email delivery.

**ANSWER**: Exelon admits that it has subscribed to NIW and has received copies of NIW via email. Exelon denies Plaintiffs' apparent interpretation of the terms of those subscriptions and therefore denies the remainder of the allegations in Paragraph 29.

30. One of the recipients of NIW, Mr. Kenneth Petersen, Vice President, Nuclear Fuels has been a designated recipient of NIW since November 9, 2011.

**ANSWER**: Exelon admits that Mr. Peterson has received at least some copies of NIW since November 9, 2011. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 30 and therefore denies the same.

31. On November 20, 2019, Defendant most recently renewed its subscription for Mr. Petersen and one other individual to each receive a single-copy of NIW via email delivery for a one-year period, which will expire on November 18, 2020.

**ANSWER**: Exelon admits that it renewed its subscription of NIW in 2019. Exelon denies Plaintiffs' apparent interpretation of the terms of those subscriptions and therefore denies the remainder of the allegations in Paragraph 31.

18

32.     From at least as early as 2011 through the present, Plaintiffs transmitted to Defendant invoices and/or subscription agreements on an annual basis for the renewal of its subscription to NIW (the "NIW Agreements"). By way of example, the invoice and subscription agreement for Defendant's two-copy license to NIW, which was in effect on March 15, 2019 (the "2018-2019 NIW Agreement"), specifically states that:

> By payment of this invoice and/or use of EIG Services, you hereby acknowledge receipt, review and acceptance of Energy Intelligence's terms and conditions shown on the reverse side of this invoice.

A copy of the invoice and subscription agreement are annexed hereto as Exhibit D.

**ANSWER**: Exelon admits that Plaintiffs periodically transmitted invoices to Exelon. Exelon admits that Exhibit D appears to be a copy of an invoice covering the 2018–2019 period that contains the language quoted in Paragraph 32. Exelon denies Plaintiffs' apparent interpretation of the terms of Exelon's subscription agreements. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 32 and therefore denies the same.

33.     The 2018-2019 NIW Agreement further states in part that:

> [a]ll unauthorized reproductions, or disseminations or other uses of material contained in the EIG Services shall be deemed willful infringement of EIG's copyright and/or other proprietary and intellectual property rights.

**ANSWER**: Exelon admits that its subscription agreement covering the 2018–2019 period includes the text quoted in Paragraph 33. Exelon denies that the allegations in Paragraph 33 fully or accurately summarize the terms of the agreement and denies any characterization or interpretation that is inconsistent therewith.

34.     Defendant has accepted the terms of the NIW Agreements as well as the subscription services provided by Plaintiffs under the NIW Agreements.

**ANSWER**: Exelon admits that it entered into subscription agreements concerning NIW and has received copies of NIW via email.  Exelon denies Plaintiffs' apparent interpretation of the terms of those agreements and therefore denies the remainder of the allegations in Paragraph 34.

### E.     Defendant's Infringement of the Registered NIW Works

35.     Plaintiffs have analyzed data reflecting Defendant's activity on the servers of the third-party email delivery service (the "Delivery Service") that delivers NIW to Defendant. Although neither Plaintiffs nor the Delivery Service have ever accessed Defendant's servers or computer systems, various employees of Defendant have downloaded certain information and images contained in the cover email provided with each issue of NIW from the Delivery Service's servers.

**ANSWER**: Exelon denies that it committed any acts constituting copyright infringement.  Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 35 and therefore denies the same.

36.     The data from the Delivery Service's servers indicates that the emails delivering NIW were opened multiple times each day, using multiple unique devices. Upon information and belief, Defendant has been copying and distributing copies of the Registered NIW Works to employees of Defendant.

**ANSWER**: Exelon denies that it committed any acts constituting copyright infringement. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 36 and therefore denies the same.

37.     Upon information and belief, the email delivering the March 15, 2019 Registered NIW Work to Kenneth Petersen was opened approximately 102 times on 35 unique devices, in association with multiple copies of NIW and demonstrating that Defendant distributed copies of the March 15, 2019 Registered NIW Work to multiple employees of Defendant.

**ANSWER**: Exelon denies that it committed any acts constituting copyright infringement. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 37 and therefore denies the same.

38.     Upon information and belief, between July 20, 2018 and October 18, 2019, the approximately 65 emails delivering NIW to Kenneth Petersen during that period were opened 880 times on 159 unique devices by various employees of Defendant and/or others, further demonstrating Defendant's copying and distribution of the Registered NIW Works to employees of Defendant and/or others.

**ANSWER**: Exelon denies that it committed any acts constituting copyright infringement. Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 38 and therefore denies the same.

39.     Upon information and belief, the unlawful copying and distribution of the Registered NIW Works by Defendant began as least as early as November 10, 2011 and has continued through to the present.

**ANSWER**: Denied.

40.     Upon information and belief, Defendant's email servers, servers, and computer systems are highly secure and only those individuals or entities that Defendant designates may access them.

**ANSWER**: Admitted.

41.     Upon information and belief, Defendant's email servers, servers, and computer systems cannot be accessed by the general public or by Plaintiffs.

**ANSWER**: Admitted.


42.     Upon information and belief, despite notice of the numerous Copyright Notice and Warnings against reproduction and copying and the terms and conditions of Defendant 's subscriptions to NIW, Defendant has been making copies of the Registered NIW Works, and the articles contained therein, and forwarding or otherwise distributing the same, all in violation of Plaintiffs' copyrights in the Registered NIW Works.

**ANSWER**: Denied.


43.     Plaintiffs have never authorized Defendant to copy, transmit, or distribute the Registered NIW Works in a manner exceeding the scope of its subscription licenses.

**ANSWER**: Denied.


44.     Upon information and belief, Defendant actively and willfully infringed Plaintiffs' registered copyrighted works and concealed its regular and systematic copying and forwarding of the Registered NIW Works, and the articles contained therein, from Plaintiffs.

**ANSWER**: Denied.


45.     By unlawfully copying, transmitting and distributing the Registered NIW Works, Defendant has, and is, violating Plaintiffs' exclusive rights to reproduce and distribute the Registered NIW Works.

**ANSWER**: Denied.


46.     Upon information and belief, Defendant's acts of copying and distributing the Registered NIW Works constitute willful infringement of Plaintiffs' Registered NIW Works.

**ANSWER**: Denied.

## COUNT ONE

## (INFRINGEMENT OF THE REGISTERED NIW WORKS)

47.     Plaintiffs repeat and reallege the allegations of Paragraphs 1-46 as though fully set forth herein.

**ANSWER**: Exelon realleges and incorporates by reference its answers to Paragraphs 1 through 46 as though fully set forth herein.

48.     The Registered NIW Works are highly original and contain creative expression and independent analysis. The individual works comprising the Registered NIW Works are original works copyrightable under 17 U.S.C. § 102(a).

**ANSWER**: Exelon denies the allegations in the first sentence of Paragraph 48.  Exelon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 48 and therefore denies the same.

49.     Plaintiffs owns all right, title, and interest in and to the Registered NIW Works and are the owners of valid copyright registrations for the Registered NIW Works. *See* Exhibit B.

**ANSWER**: Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies the same.

50.     As the owner of the Registered NIW Works, Plaintiffs have the exclusive right to reproduce the Registered NIW Works and distribute copies of the Registered NIW Works pursuant to Section 106 of the Copyright Act, 17 U.S.C. § 106.

**ANSWER**: Paragraph 50 states a legal conclusion as to which no response is required. To the extent a response is required, Exelon is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies the same.

51. Copies of the Registered NIW Works were made available to and were received by Defendant pursuant to subscription agreements for a two-copy license to NIW.

**ANSWER**: Denied.


52. Upon information and belief, Defendant has for years willfully copied and distributed the Registered NIW Works on a consistent and systematic basis, without Plaintiffs' authorization or consent, and concealed these activities from Plaintiffs.

**ANSWER**: Denied.


53. Based on the inclusion of the Copyright Notice and Warnings contained in each of Plaintiffs' publications, in the language in the subscription agreements, including the Registered NIW Works, in the language of the subscription agreements, in the transmittal cover emails delivering the NIW publications to Defendant, and on Plaintiffs' website, Defendant knew and/or was on notice that the Registered NIW Works were and are protected by the copyright laws, and Defendant is therefore unable to assert a defense of innocent infringement. *See* 17 U.S.C. § 401(d).

**ANSWER**: Paragraph 53 states a legal conclusion as to which no response is required.

To the extent a response is required, Exelon denies that the allegations in Paragraph 53 fully

or accurately summarize the terms of Exelon's subscription agreements, denies any

characterization or interpretation that is inconsistent therewith, and denies the remainder of the

allegations in Paragraph 53.


54. Defendant's subscription agreements for a two-copy license to NIW, and U.S. copyright law, prohibit copying and distributing of the Registered NIW Works. 17 U.S.C. § 501(a).

**ANSWER**: Paragraph 54 states a legal conclusion as to which no response is required.

To the extent a response is required, Exelon denies that the allegations in Paragraph 54 fully

or accurately summarize the terms of Exelon's subscription agreements, denies any characterization or interpretation that is inconsistent therewith, and denies the remainder of the allegations in Paragraph 54.

55.     Upon information and belief, Defendant willfully infringed the copyrights in the Registered NIW Works by acting with knowledge that its actions constituted infringement, or at least with reckless disregard of the possibility that the conduct complained about constitutes infringement.

**ANSWER**: Denied.

56.     Defendant's acts violate Plaintiffs' exclusive rights under § 106 of the Copyright Act of 1976, 17 U.S.C. § 106, as amended, and constitute willful infringement of Plaintiffs' copyrights in the Registered NIW Works. Defendant's past and continuing copying, transmitting, and distribution of Plaintiffs' Registered NIW Works constitute a willful, deliberate, and ongoing infringement of Plaintiffs' copyrights and are causing irreparable harm and damage to Plaintiffs.

**ANSWER**: Denied.

57.     Plaintiffs have no adequate remedy at law.

**ANSWER**: Exelon denies that Plaintiffs are entitled to any remedy whatsoever. To the extent Plaintiffs are entitled to a remedy, Exelon denies that Plaintiffs have no adequate remedy at law.

## **JURY DEMAND**

Exelon hereby demands a trial by jury on all issues so triable.

### RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF

Exelon denies that Plaintiffs are entitled to any relief whatsoever from Exelon, including without limitation the relief requested in the Complaint's Prayer for Judgment and Relief.

### AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, and specifically reserving the right to assert additional affirmative defenses as additional information becomes available through discovery or otherwise, Exelon asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

1.      At least a portion of Exelon's alleged infringing conduct occurred more than three years before the commencement of this action. Plaintiffs discovered, or with due diligence should have discovered, at least a portion of the alleged infringing conduct more than three years before the commencement of this action. For example, Plaintiffs specifically identify U.S. Copyright Registration No. TX 7-617-881 in their Complaint for Copyright Infringement.  The issues of NIW corresponding to such registration were published and transmitted to Exelon in 2011.  Plaintiffs regularly analyzed data reflecting Exelon's activity on the servers of a third-party email delivery service, and yet Plaintiffs did not initiate this action until July 2020.

2.      Plaintiffs' claim is barred in whole or in part by 17 U.S.C. § 507(b).

26

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

3.        Plaintiffs knew, or with due diligence should have known, of the alleged infringing conduct years before the commencement of this action. Plaintiffs failed to bring suit within a reasonable time. For example, Plaintiffs specifically identify U.S. Copyright Registration No. TX 7-617-881 in their Complaint for Copyright Infringement.  The issues of NIW corresponding to such registration were published and transmitted to Exelon in 2011. Plaintiffs regularly analyzed data reflecting Exelon's activity on the servers of a third-party email delivery service, and yet Plaintiffs did not initiate this action until July 2020.

4.        Exelon has been prejudiced by Plaintiffs' unreasonable delay, as the passage of time will make collection of evidence rebutting Plaintiffs' claims more difficult or impossible.

5.        Plaintiffs' claim is barred by the doctrine of laches.

## THIRD AFFIRMATIVE DEFENSE
### (License)

6.        Exelon's alleged infringing conduct was explicitly or implicitly licensed or otherwise authorized by Plaintiffs. For example, the relevant licensing agreement states that "EIG Services may be accessed and/or used solely by the individual(s) expressly named on this invoice under the 'Shipped to' notation." Such notation identifies Exelon Generation Co.

7.        Plaintiffs' claim is barred by an explicit or implicit license.

## FOURTH AFFIRMATIVE DEFENSE
### (Copyright Misuse)

8.      Plaintiffs have engaged in acts that wrongfully attempted to extend the scope of the limited monopoly granted by the Copyright Act.

9.      On information and belief, Plaintiffs deliberately registered at least some Registered NIW Works as works for hire when they were not. For example, Plaintiffs alleged that they have reporters, editors, and analysts who create NIW articles, but they do not allege for each Registered NIW Work that such creators are employees acting within the scope of their employment or contractors whose written agreements appropriately designated their work as a work made for hire.

10.     Plaintiffs' claim is barred by the doctrine of copyright misuse.

## FIFTH AFFIRMATIVE DEFENSE
### (Unavailability of Damages)

11.     Plaintiffs are barred from claiming statutory damages or attorney's fees under that statute for all alleged acts of infringement occurring sufficiently before registration of the allegedly infringed Registered NIW Work pursuant to 17 U.S.C. § 412.

## SIXTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate of Damages)

12.     On information and belief, including Plaintiffs' allegations of monitoring Exelon's use of Registered NIW Works, Plaintiffs knew of the alleged infringing conduct years before the commencement of this action, yet they took no steps to reduce or avoid the alleged damages.

13.     Plaintiffs' claim is barred, in whole or in part, because Plaintiffs made no attempt to mitigate their claimed damages.

## SEVENTH AFFIRMATIVE DEFENSE
### (First Sale)

14.     To the extent Plaintiffs' Complaint alleges that a person who lawfully purchased a copy of a Registered NIW Work committed infringement by lending or giving away the copy, Plaintiffs' claim is barred under the first sale or exhaustion doctrine.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unclean hands)

15.     Plaintiffs' business model is predicated on luring customers into subscription agreements, entrapping them in copyright lawsuits, and then extorting massive settlements that have no relationship to the actual value of Plaintiffs' publications.

16.     Exelon incorporates the paragraphs of its Counterclaims as if fully set forth herein.

17.     Plaintiffs' claim is barred under the doctrine of unclean hands.

## NINTH AFFIRMATIVE DEFENSE
### (Fraud)

18.      Plaintiffs market themselves to customers, including Exelon, as a business engaged in publishing informational newsletters for the global energy industry, when in fact their true business—and the source of nearly all their profits—is bringing copyright infringement suits against those customers.

19.    Exelon incorporates the paragraphs of its Counterclaims as if fully set forth herein.

20.    Plaintiffs' claim is barred due to their fraud.

## COUNTERCLAIMS

Counterclaim Plaintiff Exelon Generation Company, LLC, for its Counterclaims against Counterclaim Defendants Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited, alleges as follows:

## PARTIES

1.    Counterclaim Plaintiff Exelon Generation Company, LLC ("Exelon") is a Pennsylvania limited liability company with its headquarters in Kennett Square, Pennsylvania.

2.    Counterclaim Defendant Energy Intelligence Group, Inc. ("EIG, Inc.") is a Delaware corporation with its principal place of business in New York, New York 10016.

3.    Counterclaim Defendant Energy Intelligence Group (UK) Limited ("EIG UK" and, together with EIG, Inc., the "Counterclaim Defendants" or "EIG") is a United Kingdom limited company with its principal place of business in London, United Kingdom.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over EIG's claims under the Copyright Act pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Exelon's

Counterclaims pursuant to 28 U.S.C. § 1367 because the Counterclaims are so related that they form part of the same case or controversy.

5.    In addition, the Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the Counterclaims are an action between a citizen of the Commonwealth of Pennsylvania (Exelon), on the one hand, and a citizen of the States of New York and Delaware (EIG, Inc.) and a subject of a foreign state (EIG UK), on the other, and the amount in controversy exceeds $75,000.

6.    This Court has personal jurisdiction over EIG, Inc. and EIG UK because they consented to jurisdiction by filing the original Complaint (Dkt. 1) in this action.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A.    Introduction.

8.    Exelon is one of the largest, most efficient clean energy producers in the United States.  Exelon's fleet has a generating capacity of more than 30,000 megawatts, enough to power more than 20 million homes and businesses.  Exelon is America's leading provider of zero-carbon nuclear energy, operating zero-carbon nuclear plants with more than 18,700 megawatts from 21 reactors at 12 facilities in Illinois, Maryland, New York, and Pennsylvania. Exelon also operates a diverse mix of wind, solar, hydroelectric, natural gas and oil facilities, in 17 states and Canada, that provide nearly 12,000 megawatts of safe, efficient energy.

9. EIG purports to be a business engaged in publishing informational newsletters for the global energy industry. Exelon has subscribed to one of those publications, *Nuclear Intelligence Weekly* ("*NIW*") (formerly called *Uranium Intelligence Weekly*), since that publication's inception in 2007. During that period, employees of Exelon have also regularly shared industry-related information in response to requests from EIG, which EIG has then utilized in its publications.

10. As Exelon has only recently become aware, however, EIG's business model is actually predicated on luring customers into subscription agreements, entrapping them in copyright lawsuits, and then extorting massive settlements that have no relationship to the actual value of EIG's publications. Indeed, EIG offers bonuses to employees who identify potential opportunities for copyright litigation, with an additional bonus if the lawsuit leads to a monetary recovery for EIG.

11. Since 2005, one or both of EIG, Inc. and EIG UK have brought more than 75 federal copyright infringement suits similar to EIG's suit against Exelon here. EIG's copyright infringement lawsuits against its customers have accounted for the majority of EIG's profits for more than a decade.

**B.** **EIG's Scheme to Increase Its Revenue by Aggressively Pursuing Copyright Litigation Against Its Customers.**

12. In 2005, EIG—which was just breaking even—decided that its subscription-based business was insufficiently profitable in the digital era. *EIG v. Kayne Anderson*, No. 4:14-cv-01903 (S.D. Tex. Apr. 7, 2017) (hereafter, "*Kayne Anderson*") Dkt. 171-22 at

EIGvKayne037705-06; Dep. Tr. of Thomas Wallin at 195:13-21, *Kayne Anderson* Dkt. 171-12.  To address this problem, EIG settled on a strategy of aggressively pursuing copyright litigation as a way to generate additional revenue and profits.  *Kayne Anderson* Dkt. 171-22 at EIGvKayne037705-06.

13.     To accomplish this goal, EIG would lure unwitting customers into subscription agreements, aggressively and covertly track their activity, entrap them in copyright lawsuits, and then extract massive windfall settlements not rationally tied to the conduct at issue.  EIG's ownership and board of directors signed off on this strategy.  *Kayne Anderson* Dkt. 171-21.

14.     A 2007 email from EIG's Vice President of Sales and Marketing, Mark Hoff, to George King, EIG's Chief Financial Officer, summarized the scheme: "[W]e are . . . defending our 'old' model in 2 ways: 1) suing our clients and 2) leveraging copyright abuse cases with negotiated commercial deals . . . Mark [Wellman] supervises the first strategy; I supervise the second.  It's clear from the board meeting that Mark's stated goal is to aggressively pursue the rest of our large clients with lawsuits, and in this appears to have the support of board and ownership." *Kayne Anderson* Dkt. 171-21.  Mr. Hoff explicitly noted that the first strategy—suing EIG's clients—included "***random entrapment efforts*** led by Mark." *Id.* (emphasis added).

15.     EIG's scheme to increase its revenues by entrapping its customers and aggressively pursuing copyright litigation against them was far more profitable than merely selling subscriptions.  Between 2008 and 2009, for example, EIG's revenue declined 7% when

revenue from copyright litigation was excluded, but increased 27% when copyright litigation was included. *Kayne Anderson* Dkt. 171-12 at 223:19-224:7; , *Kayne Anderson* Dkt. 171-34 at EIGvKayne039285.

16.     In 2009, an internal EIG Sales and Marketing report disclosed that EIG's sales program now included "aggressive tracking of clients suspected of copyright abuse and systematic application of copyright protection software and other detection methods." *Kayne Anderson* Dkt. 171-34 at EIGvKayne039285.

17.     In 2010, EIG "ratchet[ed] up" its efforts even further. Dep. Tr. of Mark Hoff at 103:5-104:6, *Kayne Anderson* Dkt. 171-20.

18.     For instance, EIG began offering a $5,000 bonus to employees who identify potential opportunities for copyright litigation, with an additional $5,000 if the lawsuit leads to a monetary recovery for EIG. Dep. Tr. of Deborah Brown at 77:10-16, *Kayne Anderson* Dkt. 171-16); *Kayne Anderson* Dkt. 171-12 at 77:1-78:14; *Kayne Anderson* Dkt. 171-20 at 108:19-109:21.

19.     In addition, upon information and belief, EIG has staff exclusively dedicated to managing its copyright scheme. Dep. Tr. of Mark Wellman at 7:6-8:18, *Kayne Anderson* Dkt. 171-14. This staff is handsomely compensated with a percentage of the cash EIG receives from its copyright litigation scheme. *Kayne Anderson* Dkt. 171-29); *Kayne Anderson* Dkt. 171-12 at 217:10-17.

20.     For example, in one year, EIG paid Mark Wellman more than $1 million in commissions based solely on his management of EIG's copyright litigation scheme.  *Kayne Anderson* Dkt. 171-24 at EIGvKayne002097, EIGvKayne002120; *Kayne Anderson* Dkt. 171-12 at 246:6-18.  This level of compensation leaves little incentive for EIG to prevent copyright infringement before it starts or to warn customers about potential infringements in good faith.

21.     EIG's copyright litigation scheme has been wildly successful, allowing EIG to increase its profits even while its subscription business was declining.  Between August 2011 and January 2013, for example, EIG lost 400 single-subscriber accounts. *Kayne Anderson* Dkt. 171-19.  Revenue from EIG's copyright litigation scheme, however, allowed EIG to remain profitable.  Indeed, for the period from 2005 through 2013, copyright litigation accounted for about ***94% of EIG's profits***.  *Kayne Anderson* Dkt. 171-22.

22.     EIG intentionally kept this scheme secret from its customers, including Exelon.  EIG's website markets EIG as "a leading independent provider of objective insight, unbiased analysis and reliable data for over 60 years."  EnergyIntel.com, *About Energy Intelligence Group*, available at https://www.energyintel.com/pages/company-index.aspx. (last visited May 19, 2021).

23.     EIG's website also states: "We constantly improve and expand our products and services in anticipation of the industry's changing needs.  In recent years, we have expanded our leading coverage to include *Nuclear Intelligence Weekly* and a page dedicated to carbon and climate change in *World Gas Intelligence*."  *Id.*

35

24. But the publications that EIG touts on its website are not, in fact, how EIG stays profitable. Nearly all of EIG's profit comes not from the subscription fees that its customers pay for EIG's publications, but from its aggressive pursuit of copyright litigation against those customers. EIG does not disclose these facts about its true business model, nor does it disclose how many customers from whom it sought to extort settlements through its scheme.

## C. EIG Confuses and Misleads Its Customers As to What Is Permissible.

25. On information and belief, EIG's written subscription agreements are purposefully vague in order to confuse and mislead customers like Exelon as to what is and is not permissible.

26. For example, Section 1(c) of each of the annual subscription agreements that EIG provided to Exelon for the period between November of 2013 and November of 2018 (collectively, the "Standard Licensing Agreements") provided: "Authorized Users may occasionally distribute a copy of a story from the EI Services to a few individuals, and in a non-systematic manner in the ordinary course of business, provided the copyright and other proprietary rights notices are included and that Subscriber and/or Authorized User does not edit, alter or abridge the content from the EI Services." *See*, *e.g.*, Standard License Agreement Order Form and Standard License Agreement for November 14, 2013 through November 13, 2014.

27. The Standard Licensing Agreements further stated that, "*[e]xcept as otherwise noted in this Section l(c)*, no content from the EI Services may be downloaded, transmitted,

broadcast, transferred, assigned, reproduced or in any other way used or disseminated in any form, to any person not specifically identified herein as an Authorized User, without the explicit written consent of Energy Intelligence in each instance." *Id.* (emphasis added).

28.     EIG compounded the ambiguity that these vague provisions created by including a written notice in some of the e-mails by which EIG transmitted its registered works that "reproduction or distribution internally or externally *in any manner* . . . including by . . . forwarding . . . is strictly prohibited." Dkt. 1, EIG Compl. ¶ 21 (emphasis added).  Contributing further to the obfuscation and lack of clarity, EIG maintained internal "unwritten" copyright policies that materially differed from these written notices.  For example, EIG's former President, Tom Wallin, swore under oath that EIG had a "long-standing," "unwritten" policy allowing administrative assistants to forward publications to their supervisors. *Kayne Anderson* Dkt. 171-12 at 71:18-72:12.

29.     In addition, the subscription agreement that EIG provided to Exelon for the period from November 19, 2018 through November 18, 2019 stated that "EIG Services may be accessed and/or used solely by the individual(s) expressly named on this invoice under the 'Shipped to' notation ('Authorized User(s)')" and further stated that an Authorized User "can only be a living individual and never a company, organization or any other entity," but did not in fact identify *any* "individual" under the invoice's "Ship To" notation. *See* Dkt. 1, Ex. D. Instead, the invoice identified Exelon itself under the "Ship To" notation. *Id.*

30.     EIG's contradictory and vague terms and its unwritten policies prevent customers like Exelon from understanding what activities EIG permits and prohibits.

31.     Upon information and belief, EIG knows that its customers lack clarity about what is permissible under EIG's written and unwritten policies, but intentionally does not properly educate customers so that it can entrap those customers in litigation that is substantially more profitable to EIG than the customers' subscriptions.

## D.     **EIG Tracks Its Customers' Use of Its Publications with the Goal of Discovering Potential Infringement and Extorting Large Settlements.**

32.     In addition to incentivizing employees to uncover potential copyright infringement, EIG engages in substantial covert tracking efforts to bolster its litigation scheme.

33.     At least as early as September 2009, EIG instituted efforts to "aggressive[ly]" track its clients using the "systematic application of copyright protection software." *Kayne Anderson* Dkt. 171-__ at EIGvKayne039285.

34.     EIG's complaint alleges that it analyzes data from an email delivery system that allows EIG to see when a publication is opened multiple times from multiple devices. *See* Dkt. 1 ¶ 35. Although EIG's Standard License Agreements with Exelon included a statement that Exelon "consent[ed]" to EIG's "tracking usage of the EI Services, through electronic tracking technology," EIG did not disclose that it was tracking Exelon for the purpose of instituting litigation and Exelon never consented to any usage of tracking information for improper, fraudulent, purposes.

35.     Moreover, EIG's Complaint indicates that, as a result of its email tracking, it had actual notice of Exelon's alleged infringement as early as July 20, 2018 but, upon information and belief, delayed filing suit until July of 2020 to increase its claimed damages. Dkt. 1 ¶ 38.  In view of its tracking, EIG's knowledge of the allegedly infringing conduct may extend back to 2011.

36.     EIG also waited until May of 2020 to advise Exelon that EIG believed Exelon's employees were violating the subscription agreements and EIG's copyrights, and then it did so by way of a demand letter that threatened suit and gave Exelon a mere five days to respond.

37.     The fact is, EIG is not interested in simply recouping its actual alleged damages or protecting its copyrights by alerting its customers to potentially infringing activities so that the customers can take steps to address the violations.  Upon information and belief, EIG *wants* its customers to infringe so that it can lie in wait and blindside them with a lawsuit for tens of millions of dollars even when its claimed damages are not remotely related to its demands.

## COUNT ONE
### (VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT)

38.     Exelon re-alleges and incorporates Paragraphs 1 through 37 of the Counterclaim as if fully set forth herein.

39.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS § 505/1, et seq.) declares unlawful any unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false

promise, or misrepresentation, or the concealment, suppression or omission of any material

fact, with intent that others rely upon the concealment, suppression or omission of such material

fact.

40.     The Exelon employees who interacted with EIG with respect to Exelon's annual

subscriptions to *NIW* are or were located at Exelon's regional headquarters in Warrenville,

Illinois.  EIG's subscription agreements and invoices for *NIW* were sent to Exelon's regional

headquarters in Warrenville, Illinois.

41.     EIG markets itself to consumers in Illinois, including Exelon, as a business

engaged in publishing informational newsletters for the global energy industry, when in fact

its true business—and the source of nearly all its profits—is bringing copyright infringement

suits against those customers.

42.     In both written and oral communications with Exelon employees located in

Illinois, EIG concealed, suppressed, and/or omitted material information, including but not

limited to the facts that (1) EIG intends to entrap its customers in copyright litigation, (2) EIG

seeks to aggressively pursue its customers for copyright violations, (3) EIG seeks to obtain

windfall settlements from its customers, (4) EIG's business model is predicated on suing its

customers in copyright litigation, (5) EIG incentivizes its employees to uncover potential

copyright lawsuits by paying up to $10,000 bonuses, (6) EIG incentivizes other employees by

offering them a cut of any proceeds generated through copyright litigation, (7) EIG derives

40

nearly all of its profits from copyright litigation, and (8) EIG electronically tracks its customers' usage of EIG's subscriptions for the purpose of instituting litigation.

43.     EIG intentionally omitted this material information in all of its dealings with Exelon, including in invoices and communications sent to Exelon regarding subscriptions to *NIW* on or around, but not limited to, the following dates: September 25, 2013; December 15, 2014; October 28, 2015; December 9, 2016; November 6, 2017; November 20, 2018; and November 21, 2019.  On or around each of these dates, EIG's representatives corresponded with Exelon to sell subscriptions to *NIW* without disclosing the material information referenced above.

44.     EIG's misrepresentations and omissions were made by EIG sales representatives as well as the EIG employees responsible for managing its copyright litigation scheme, including Mark Hoff, Brian Bowman, Dan Horner, and Derrick Dent.  EIG's employees such as Derrick Dent have been involved in entrapping other EIG customers, demonstrating a systemic plan to manufacture copyright infringement claims.

45.     EIG's employees including editors and reporters, such as Philip Chaffee and Jessica Reyes Sondgeroth, also regularly solicited information from Exelon in furtherance of EIG's publications without disclosing that EIG was tracking Exelon's usage of those publications for the purpose of instituting copyright litigation.  EIG's employees have contacted Exelon's employees via work email accounts.  When those communications were

blocked by Exelon, EIG's employees then reached out to the Exelon employees' personal accounts, including the Exelon employees' LinkedIn accounts.

46. For example, EIG regularly contacted Exelon's employees for pricing information concerning uranium. Those emails stated, in pertinent part, "we rely on honest and realistic price assessments" from panel members, including Exelon, to "fulfill our commitment … to our readers[.]" In one email, Philip Chaffee noted that EIG has been using Exelon's information ever since EIG launched the price panel in 2007, and that they would "hate to lose Exelon as a participant."

47. The information that EIG concealed, suppressed and/or omitted is the type of information upon which a buyer of EIG's services would be expected to rely in deciding whether to subscribe to EIG's publications.

48. EIG's superior knowledge of these essential facts rendered its nondisclosure inherently unfair because Exelon was unaware of EIG's true intent, unsavory business practices, and desire to entrap and extort it.

49. Exelon would not have subscribed to *NIW* had it known the information that EIG concealed, suppressed and/or omitted.

50. EIG had a motive to engage in a fraudulent scheme because EIG derives nearly all of its profits from copyright litigation. EIG also provides financial incentives that discourage good-faith discussions with customers regarding the permissible use of EIG's publications.

51.     The conduct of EIG as described herein constitutes unfair and/or deceptive acts or practices in violation of Section 505/2 of the ICFA.

52.     EIG acted with malice, knowledge, willfulness, and intent to defraud as evidenced by the allegations above, including but not limited to EIG's internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

53.     Exelon has suffered actual damages as a result of EIG's violations of the ICFA, including but not limited to the amounts Exelon paid EIG to subscribe to *NIW* and the costs it must now incur in defending against EIG's copyright infringement lawsuit.

### COUNT TWO
### (FRAUD)

54.     Exelon re-alleges and incorporates Paragraphs 1 through 37 of the Counterclaim as if fully set forth herein.

55.     EIG knowingly made materially false and misleading factual representations and knowingly omitted material information from Exelon regarding EIG's subscriptions, business model, and intentions with the intent to defraud and entrap Exelon in a lawsuit.

56.     EIG markets itself to customers, including Exelon, as a business engaged in publishing informational newsletters for the global energy industry, when in fact its true business—and the source of nearly all its profits—is bringing copyright infringement suits against those customers.

57.     In its business dealings with Exelon, EIG concealed, suppressed and/or omitted numerous material facts, including but not limited to the facts that (1) EIG intends to entrap its

customers in copyright litigation, (2) EIG seeks to aggressively pursue its customers for copyright violations, (3) EIG seeks to obtain windfall settlements from its customers, (4) EIG's business model is predicated on suing its customers in copyright litigation, (5) EIG had filed more than 75 lawsuits against its own customers for alleged copyright violations, (6) EIG incentivizes employees to uncover potential copyright lawsuits by paying up to $10,000 bonuses, (7) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (8) EIG derives nearly all of its profits from copyright litigation, and (9) EIG electronically tracks its customers' usage of EIG's subscriptions for the purpose of instituting litigation.

58. EIG had a duty to disclose these omitted facts because each time EIG sold or renewed subscriptions or otherwise contacted Exelon, it made partial, incomplete, and ambiguous statements about its business and intentions that required additional disclosures to avoid misleading Exelon.

59. EIG also had a duty to disclose these omitted facts because it possessed unique and superior knowledge that was not readily available to Exelon about EIG's business and intentions, which placed EIG in a position of influence and superiority over Exelon.

60. EIG intentionally omitted this material information in all of its dealings with Exelon, including in invoices and communications sent to Exelon regarding services for *Nuclear Intelligence Weekly* on or around, but not limited to, the following dates: September 25, 2013; December 15, 2014; October 28, 2015; December 9, 2016; November 6, 2017;

November 20, 2018; and November 21, 2019.  These instances are only a few examples of EIG's continuous conduct and pattern of misrepresentations and omissions.

61.    On or around each of these dates, EIG's representatives corresponded with Exelon in an effort to sell publications to Exelon; however, in each case, EIG failed to disclose the material information referenced above.

62.    EIG's misrepresentations and omissions were made by EIG sales representatives as well as the EIG employees responsible for managing its copyright litigation scheme, including Mark Hoff, Brian Bowman, Dan Horner, and Derrick Dent.  EIG's employees such as Derrick Dent have been involved in entrapping other EIG customers, demonstrating a systemic plan to manufacture copyright infringement claims.

63.    EIG's employees including editors and reporters, such as Philip Chaffee and Jessica Reyes Sondgeroth, also regularly solicited information from Exelon in furtherance of EIG's publications without disclosing that EIG was tracking Exelon's usage of those publications for the purpose of instituting copyright litigation.  EIG's employees have contacted Exelon's employees via work email accounts.  When those communications were blocked by Exelon, EIG's employees then reached out to the Exelon employees' personal accounts, including the Exelon employees' LinkedIn accounts.

64.    EIG knew at the time such representations were made that they were false and misleading, and that material information was being omitted.

45

65. EIG intended and knew that Exelon would rely on its misrepresentations and material omissions to induce Exelon to pay EIG for its publications.

66. Exelon reasonably and justifiably relied on EIG's representations and material omissions when it entered into business with EIG.

67. Exelon did not know and could not have known through the exercise of ordinary diligence that EIG's representations were false and misleading or that material information was being omitted.

68. EIG received value from its fraudulent scheme through subscription revenue, and EIG now seeks additional revenue through this lawsuit, the culmination of the scheme.

69. EIG acted with malice, knowledge, willfulness, and intent to defraud as evidenced by the allegations above, including but not limited to EIG's internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

70. EIG had a motive to engage in a fraudulent scheme because EIG derives nearly all of its profits from copyright litigation. EIG also provides financial incentives that discourage good-faith discussions with customers regarding the permissible use of EIG's publications.

71. As a foreseeable result of EIG's material misrepresentations and omissions, Exelon has been damaged by EIG's fraudulent conduct.

72. Exelon never would have paid for EIG's newsletters had EIG informed Exelon about the material misrepresentations and omissions noted above.

46

73.     Exelon now must spend time and resources investigating and defending against EIG's lawsuit.

## COUNT THREE
## (FRAUD IN THE INDUCEMENT)

74.     Exelon re-alleges and incorporates Paragraphs 1 through 37 of the Counterclaim as if fully set forth herein.

75.     EIG knowingly made materially false and misleading factual representations and knowingly omitted material information from Exelon regarding EIG's business and intentions with the intent to defraud and entrap Exelon in a lawsuit.

76.     EIG markets itself to customers, including Exelon, as a business engaged in publishing informational newsletters for the global energy industry, when in fact its true business—and the source of nearly all its profits—is bringing copyright infringement suits against those customers.

77.     In its business dealings with Exelon, EIG omitted numerous material facts, including but not limited to the facts that (1) EIG intends to entrap its customers in copyright litigation, (2) EIG seeks to aggressively pursue its customers for copyright violations, (3) EIG seeks to obtain windfall settlements from its customers, (4) EIG's business model is predicated on suing its customers in copyright litigation, (5) EIG had filed more than 75 lawsuits against its own customers for alleged copyright violations, (6) EIG incentivizes employees to uncover potential copyright lawsuits by paying up to $10,000 bonuses, (7) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (8)

EIG derives nearly all of its profits from copyright litigation, and (9) EIG electronically tracks its customers' usage of EIG's subscriptions for the purpose of instituting litigation.

78.     EIG had a duty to disclose these omissions of fact because each time EIG sold or renewed subscriptions or otherwise contacted Exelon, it made partial, incomplete, and ambiguous statements about its business and intentions that required additional disclosures to avoid misleading Exelon.

79.     EIG also had a duty to disclose these omitted facts because it possessed unique and superior knowledge that was not readily available to Exelon about EIG's business and intentions, which placed EIG in a position of influence and superiority over Exelon.

80.     EIG's superior knowledge of these essential facts rendered its nondisclosure inherently unfair because Exelon was unaware of EIG's true intent, unsavory business practices, and desire to entrap and extort it.

81.     EIG intentionally omitted this material information in all of its dealings with Exelon, including in invoices and communications sent to Exelon regarding services for *NIW* on or around, but not limited to, the following dates: September 25, 2013; December 15, 2014; October 28, 2015; December 9, 2016; November 6, 2017; November 20, 2018; and November 21, 2019.  These instances are only a few examples of EIG's continuous conduct and pattern of misrepresentations and omissions.

82. On or around each of these dates, EIG's representatives corresponded with Exelon in an effort to sell publications to Exelon; however, in each case, EIG failed to disclose the material information referenced above.

83. EIG's misrepresentations and omissions were made by EIG sales representatives as well as the EIG employees responsible for managing its copyright litigation scheme, including Mark Hoff, Brian Bowman, Dan Horner, and Derrick Dent. EIG's employees such as Derrick Dent have been involved in entrapping other EIG customers, demonstrating a systemic plan to manufacture copyright infringement claims.

84. EIG's employees including editors and reporters, such as Philip Chaffee and Jessica Reyes Sondgeroth, also regularly solicited information from Exelon in furtherance of EIG's publications without disclosing that EIG was tracking Exelon's usage of those publications for the purpose of instituting copyright litigation. EIG's employees have contacted Exelon's employees via work email accounts. When those communications were blocked by Exelon, EIG's employees then reached out to the Exelon employees' personal accounts, including the Exelon employees' LinkedIn accounts.

85. EIG knew at the time such representations were made that they were false and misleading, and that material information was being omitted.

86. EIG intended for and knew that Exelon would rely on its misrepresentations and material omissions to induce Exelon to pay EIG for its publications.

87.     Exelon reasonably and justifiably relied on EIG's false representations and omissions when it entered into business with EIG by subscribing to *NIW*.

88.     Exelon did not know and could not have known through the exercise of ordinary diligence that EIG's representations were false and misleading or that material information was being omitted.

89.     EIG received value from its fraudulent scheme through subscription revenue, and now seeks additional revenue through this lawsuit, the culmination of the fraudulent scheme.

90.     EIG acted with malice, knowledge, willfulness, and intent to defraud as evidenced by the allegations above, including but not limited to EIG's internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

91.     EIG had a motive to engage in a fraudulent scheme because, as set out above, EIG derives nearly all of its profits from copyright litigation. EIG also provides financial incentives that discourage good-faith discussions with customers regarding the permissible use of EIG's publications.

92.     As a foreseeable result of EIG's material misrepresentations and omissions, Exelon has been damaged by EIG's fraudulent conduct.

93.     Exelon never would have paid for EIG's newsletters had EIG informed Exelon about the material misrepresentations and omissions noted above.

94.     Exelon now must spend time and resources defending against EIG's lawsuit.

## **PRAYER FOR RELIEF**

WHEREFORE, Exelon respectfully requests that the Court enter judgment in favor of Exelon and against EIG on each count of the Complaint and Counterclaim, and award the following relief as judgment against EIG:

A.      Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

B.      Punitive damages in an amount to be proven at trial;

C.      An order requiring EIG to disgorge profits obtained as a result of its fraudulent and unfair actions, along with interest;

D.      Exelon's costs and expenses incurred herein, including attorneys' fees; and

E.      Such other relief as the Court may deem just, equitable, and proper.

## **JURY DEMAND**

Exelon hereby demands a trial by jury on all issues so triable.

Dated: May 19, 2021                    Respectfully submitted,

                                       */s/ Louis A. Klapp*
                                       Sondra A. Hemeryck
                                       Rodney Perry
                                       Louis A. Klapp
                                       Rachel F. Sifuentes
                                       RILEY SAFER HOLMES & CANCILA LLP
                                       70 W. Madison, Suite 2900
                                       Chicago, Illinois 60602
                                       Phone: (312) 471-8700
                                       Fax: (312) 471-8701
                                       shemeryck@rshc-law.com
                                       rperry@rshc-law.com
                                       lklapp@rshc-law.com
                                       rsifuentes@rshc-law.com

                                       *Attorneys for Defendant*
                                       *Exelon Generation Co., LLC*