**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC. and ENERGY INTELLIGENCE GROUP (UK) LIMITED, | |
| Plaintiffs, | Civil Action No. 20-cv-03983 |
| v. | Honorable Joan B. Gottschall |
| | JURY TRIAL DEMANDED |
| CONSTELLATION ENERGY GENERATION, LLC, | |
| Defendant. | |

**DEFENDANT'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS TO PLAINTIFFS' COMPLAINT FOR
COPYRIGHT INFRINGEMENT**

Defendant Constellation Energy Generation, LLC ("Constellation") submits the

following First Amended Answer, Affirmative Defenses, and Counterclaims to the Complaint

for Copyright Infringement filed by Plaintiffs Energy Intelligence Group, Inc. ("EIG") and

Energy Intelligence Group (UK) Limited ("EIG UK") (collectively, "Plaintiffs").

## INTRODUCTION

1.      Plaintiffs bring this action against Defendant under the Copyright Act of 1976, 17
U.S.C. §§ 101 *et seq.* (the "Copyright Act") for willful infringement of Plaintiffs' registered
copyrights.

**ANSWER**: Constellation admits that Plaintiffs are seeking the specified relief under the

stated statute. Constellation denies that Plaintiffs' rights have been violated and denies that

Plaintiffs are entitled to any relief.

## THE PARTIES

2.      Plaintiff EIG is a Delaware corporation with its principal place of business located
at 270 Madison Avenue, Suite 302, New York, New York 10016.

**ANSWER**: Admitted on information and belief.

3.　　　　Plaintiff EIG UK is a United Kingdom limited company with its principal place of business located at Interpark House, 7 Down Street, London, W1J 7AJ United Kingdom.

**ANSWER**: Admitted on information and belief.

4.　　　　Upon information and belief, Defendant Exelon Generation Co., is a Pennsylvania corporation with a place of business at 4300 Winfield Road, Warrenville, Illinois 60555.

**ANSWER**: Constellation denies that its full name is "Exelon Generation Co." and denies

that it is a corporation. Constellation admits that it is a Pennsylvania limited liability company with

a place of business at 4300 Winfield Road, Warrenville, Illinois 60555.

## JURISDICTION AND VENUE

5.　　　　This Court has jurisdiction over causes of action alleging copyright infringement pursuant to Sections 501, *et seq.* of the Copyright Act. Additionally, the Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because the federal courts are vested with exclusive jurisdiction in copyright cases. 28 U.S.C. § 1338(a).

**ANSWER**: Admitted.

6.　　　　This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant is present and doing business in this District, and the acts of copyright infringement alleged herein took place in this District.

**ANSWER**: Constellation denies that it committed any acts of copyright infringement.

Constellation admits that this Court has personal jurisdiction over Constellation in this action.

7.　　　　Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a).

**ANSWER**: Constellation does not contest venue in this action.

## FACTUAL BACKGROUND

### A.　　**Plaintiffs' Publications**

8.　　　　Plaintiffs, and their predecessors-in-interest, have been engaged in publishing newsletters and other publications for the highly-specialized global energy industry for nearly seventy years. In particular, Plaintiffs and their predecessors-in-interest have published the weekly newsletter *Nuclear Intelligence Weekly* ("NIW") since 2011. A representative copy of the March 15, 2019 issue of NIW is attached hereto as Exhibit A (the "March 15, 2019 Registered NIW Work").

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests have been publishing the weekly newsletter *Nuclear Intelligence Weekly* since at least 2011, and that a copy of NIW is attached to the Complaint as Exhibit A. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 and therefore denies the same.

9.      The audience for Plaintiffs' publications, including NIW, consists of individuals with an interest in the global energy and power industries, including securities brokers and dealers, consultants, bankers, investors, stock market analysts, traders, commodity analysts, and others who follow or work in these industries or sell goods and services to those in or following these industries.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and therefore denies the same.

10.      Plaintiffs' focus is on providing original, high-quality articles and analysis relating to the nuclear power, natural gas and related industries through NIW and their other publications. Plaintiffs have invested significant time and resources to create their publications, including NIW.

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests publish the weekly newsletter *Nuclear Intelligence Weekly.* Further answering, Constellation states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Constellation has only recently become aware, Plaintiffs' business model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications. Constellation denies the remaining allegations in Paragraph 10.

11.      Plaintiffs' publications do not feature or have any advertisements or sponsors in order to ensure journalistic integrity and objective reporting. Plaintiffs are, therefore, dependent on paid subscriptions to sustain the viability of their publications.

**ANSWER**: Admitted on information and belief that the weekly newsletter *Nuclear Intelligence Weekly* does not contain advertisements. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 11, and therefore denies the same. Further answering, Constellation states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Constellation has only recently become aware, Plaintiffs' business model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications. Constellation denies the remaining allegations of Paragraph 11.

12.     Plaintiffs maintain an experienced and knowledgeable editorial staff of approximately sixty (60) reporters, editors, and analysts at seven (7) editorial bureaus located in New York, Washington, D.C., Houston, London, Moscow, Dubai, and Singapore.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and therefore denies the same.

13.     The copyrighted, original content and analysis created by Plaintiffs included in their publications are valuable copyrighted works and publication assets of Plaintiffs. In addition to NIW, Plaintiffs also publish other original publications, including, but not limited to:

EI Finance;
EI New Energy;
EI New Energy Data Source;
Energy Compass;
Energy Intelligence Briefing;
International Oil Daily;
Jet Fuel Intelligence;
LNG Intelligence;
Natural Gas Week Data Source;
NGW's Gas Market Reconnaissance;
 Nefte Compass;
Nefte Compass Data Source;
Oil Daily;
Oil Market Intelligence;
Oil Market Intelligence Data Source;

Petroleum Intelligence Weekly;
Petroleum Intelligence Weekly Data Source; and
World Gas Intelligence Data Source.

**ANSWER**: Admitted on information and belief that Plaintiffs or their predecessors-in-interests publish the weekly newsletter *Nuclear Intelligence Weekly* ("*NIW*") and have obtained registered copyrights for at least some *NIW* works. Further answering, Constellation states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Constellation has only recently become aware, Plaintiffs' business model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13 and therefore denies the same.

14. Plaintiffs have developed an exemplary reputation for their high journalistic standards and the reliability of the content of all their publications, including the EIG Publications.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and therefore denies the same.

15. In order for third parties to regularly benefit from Plaintiffs' analytical and creative content contained in NIW and Plaintiffs' other publications, Plaintiffs offer various subscriptions to interested parties to access the valuable content contained therein.

**ANSWER**: Admitted that Plaintiffs offer subscriptions to *Nuclear Intelligence Weekly*. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 and therefore denies the same. Further answering, Constellation states that Plaintiffs purport to be engaged in publishing informational newsletters for the global energy industry but, as Constellation has only recently become aware, Plaintiffs' business

model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications.

16.     Interested parties have various subscription options depending on their respective needs. Subscribers typically obtain NIW and Plaintiffs' other publications by email and/or from Plaintiffs' website, which permits password-protected access to archived and/or current issues, pursuant to a subscription or license agreement. Plaintiffs' website also provides the individual articles in Plaintiffs' publications separately from the publication.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and therefore denies the same.

17.     Interested parties that do not maintain a subscription or license agreement may also purchase individual articles appearing in NIW and Plaintiffs' other publications, as well as archived articles, by using Plaintiffs' pay-per-article service. The license fee per article, per copy, is $24.00 for articles appearing in NIW. The total license fee for this pay-per-article service is the per-article price multiplied by the number of copies of the requested article.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and therefore denies the same.

18.     Interested parties that do not maintain a subscription or license agreement may also purchase individual issues of NIW including EIG Publications, as well as archived issues, from Plaintiffs using Plaintiffs' pay-per-issue service. The license fee per issue, per copy, is $395.00 for NIW. The total license fee for this pay-per-issue service is the per-issue price multiplied by the number of copies of the requested issue.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore denies the same.

### B.     Plaintiffs' NIW Copyrights

19.     Plaintiffs are the exclusive copyright owners in, and to, numerous original works of authorship including, without limitation, the issues of the Registered NIW Works and the articles which are contained therein and independently available.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore denies the same.

20.     Among other copyright registrations, Plaintiffs are the owners of the following U.S. Copyright Registrations for the following issues of NIW (hereinafter collectively referred to as the "Registered NIW Works"), attached hereto as Exhibit B:

- No. TX 7-617-881 for Volume 5 covering 4 collective works and the articles contained therein published in November 2011;
- No. TX 7-617-865 for Volume 5 covering 3 collective works and the articles contained therein published in December 2011;
- No. TX 7-616-146 for Volume 6 covering 5 collective works and the articles contained therein published in January 2012;
- No. TX 7-616-133 for Volume 6 covering 3 collective works and the articles contained therein published in February 2012;
- No. TX 7-574-386 for Volume 6 covering 5 collective works and the articles contained therein published in March 2012;
- No. TX 7-625-294 for Volume 6 covering 4 collective works and the articles contained therein published in April 2012;
- No. TX 7-630-804 for Volume 6 covering 4 collective works and the articles contained therein published in May 2012;
- No. TX 7-633-342 for Volume 6 covering 5 collective works and the articles contained therein published in June 2012;
- No. TX 7-660-942 for Volume 6 covering 4 collective works and the articles contained therein published in July 2012;
- No. TX 7-615-855 for Volume 6 covering 5 collective works and the articles contained therein published in August 2012;
- No. TX 7-614-525 for Volume 6 covering 4 collective works and the articles contained therein published in September 2012;
- No. TX0 8-054-637 for Volume 6 covering 4 collective works and the articles contained therein published in October 2012;
- No. TX0 8-054-644 for Volume 6 covering 5 collective works and the articles contained therein published in November 2012;
- No. TX 7-688-976 for Volume 6 covering 3 collective works and the articles contained therein published in December 2012;
- No. TX 7-690-160 for Volume 7 covering 4 collective works and the articles contained therein published in January 2013;
- No. TX 7-707-508 for Volume 7 covering 4 collective works and the articles contained therein published in February 2013;
- No. TX 7-710-852 for Volume 7 covering 5 collective works and the articles contained therein published in March 2013;

- No. TX 7-729-286 for Volume 7 covering 4 collective works and the articles contained therein published in April 2013;
- No. TX 7-732-033 for Volume 7 covering 5 collective works and the articles contained therein published in May 2013;
- No. TX 7-731-757 for Volume 7 covering 4 collective works and the articles contained therein published in June 2013;
- No. TX 7-759-281 for Volume 7 covering 4 collective works and the articles contained therein published in July 2013;
- No. TX 7-759-211 for Volume 7 covering 5 collective works and the articles contained therein published in August 2013;
- No. TX 7-893-781 for Volume 7 covering 4 collective works and the articles contained therein published in September 2013;
- No. TX 7-808-554 for Volume 7 covering 4 collective works and the articles contained therein published in October 2013;
- No. TX 7-954-985 for Volume 7 covering 4 collective works and the articles contained therein published in November 2013;
- No. TX 7-808-956 for Volume 7 covering 4 collective works and the articles contained therein published in December 2013;
- No. TX 7-875-053 for Volume 8 covering 5 collective works and the articles contained therein published in January 2014;
- No. TX 7-891-016 for Volume 8 covering 4 collective works and the articles contained therein published in February 2014;
- No. TX 7-927-119 for Volume 8 covering 4 collective works and the articles contained therein published in March 2014;
- No. TX 7-891-074 for Volume 8 covering 4 collective works and the articles contained therein published in April 2014;
- No. TX 7-941-640 for Volume 8 covering 5 collective works and the articles contained therein published in May 2014;
- No. TX 7-942-610 for Volume 8 covering 4 collective works and the articles contained therein published in June 2014;
- No. TX 7-934-520 for Volume 8 covering 4 collective works and the articles contained therein published in July 2014;
- No. TX 7-943-778 for Volume 8 covering 5 collective works and the articles contained therein published in August 2014;
- No. TX 7-958-698 for Volume 8 covering 4 collective works and the articles contained therein published in September 2014;
- No. TX 8-060-069 for Volume 8 covering 5 collective works and the articles contained therein published in October 2014;
- No. TX0 7-985-559 for Volume 8 covering 3 collective works and the articles contained therein published in November 2014;

- No. TX0 7-993-971 for Volume 8 covering 4 collective works and the articles contained therein published in December 2014;
- No. TX 8-445-113 for Volume 9 covering 5 collective works and the articles contained therein published in January 2015;
- No. TX 8-445-115 for Volume 9 covering 4 collective works and the articles contained therein published in February 2015;
- No. TX 8-445-119 for Volume 9 covering 4 collective works and the articles contained therein published in March 2015;
- No. TX 8-150-414 for Volume 9 covering 4 collective works and the articles contained therein published in April 2015;
- No. TX 8-210-772 for Volume 9 covering 5 collective works and the articles contained therein published in May 2015;
- No. TX 8-137-601 for Volume 9 covering 4 collective works and the articles contained therein published in June 2015;
- No. TX 8-164-011 for Volume 9 covering 5 collective works and the articles contained therein published in July 2015;
- No. TX 8-169-888 for Volume 9 covering 4 collective works and the articles contained therein published in August 2015;
- No. TX 8-170-154 for Volume 9 covering 4 collective works and the articles contained therein published in September 2015;
- No. TX 8-276-193 for Volume 9 covering 5 collective works and the articles contained therein published in October 2015;
- No. TX 8-274-825 for Volume 9 covering 4 collective works and the articles contained therein published in November 2015;
- No. TX 8-272-374 for Volume 9 covering 4 collective works and the articles contained therein published in December 2015;
- No. TX 8-228-020 for Volume 10 covering 4 collective works and the articles contained therein published in January 2016;
- No. TX 8-228-0038 for Volume 10 covering 4 collective works and the articles contained therein published in February 2016
- No. TX 8-277-773 for Volume 10 covering 4 collective works and the articles contained therein published in March 2016;
- No. TX 8-344-122 for Volume 10 covering 5 collective works and the articles contained therein published in April 2016;
- No. TX 8-285-228 for Volume 10 covering 4 collective works and the articles contained therein published in May 2016;
- No. TX 8-350-358 for Volume 10 covering 4 collective works and the articles contained therein published in June 2016;
- No. TX 8-327-965 for Volume 10 covering 5 collective works and the articles contained therein published in July 2016;

9

- No. TX 8-371-316 for Volume 10 covering 4 collective works and the articles contained therein published in August 2016;
- No. TX 8-341-785 for Volume 10 covering 5 collective works and the articles contained therein published in September 2016;
- No. TX 8-372-970 for Volume 10 covering 4 collective works and the articles contained therein published in October 2016;
- No. TX 8-351-630 for Volume 10 covering 4 collective works and the articles contained therein published in November 2016;
- No. TX 8-371-839 for Volume 10 covering 4 collective works and the articles contained therein published in December 2016;
- No. TX 8-389-221 for Volume 11 covering 4 collective works and the articles contained therein published in January 2017;
- No. TX 8-389-133 for Volume 11 covering 4 collective works and the articles contained therein published in February 2017;
- No. TX 8-384-884 for Volume 11 covering 5 collective works and the articles contained therein published in March 2017;
- No. TX 8-384-928 for Volume 11 covering 4 collective works and the articles contained therein published in April 2017;
- No. TX 8-430-673 for Volume 11 covering 4 collective works and the articles contained therein published in May 2017;
- No. TX 8-431-910 for Volume 11 covering 5 collective works and the articles contained therein published in June 2017;
- No. TX 8-430-385 for Volume 11 covering 4 collective works and the articles contained therein published in July 2017;
- No. TX 8-442-977 for Volume 11 covering 4 collective works and the articles contained therein published in August 2017;
- No. TX 8-442-939 for Volume 11 covering 5 collective works and the articles contained therein published in September 2017;
- No. TX 8-471-682 for Volume 11 covering 4 collective works and the articles contained therein published in October 2017;
- No. TX 8-506-109 for Volume 11 covering 4 collective works and the articles contained therein published in November 2017;
- No. TX 8-790-917 for Volume 11 covering 4 collective works and the articles contained therein published in December 2017;
- No. TX 8-675-970 for Volume 12 covering 3 collective works and the articles contained therein published in January 2018;
- No. TX 8-572-881 for Volume 12 covering 4 collective works and the articles contained therein published in February 2018;
- No. TX 8-582-274 for Volume 12 covering 4 collective works and the articles contained therein published in March 2018;

- No. TX 8-596-384 for Volume 12 covering 5 collective works and the articles contained therein published in April 2018;
- No. TX 8-598.961 for Volume 12 covering 4 collective works and the articles contained therein published in May 2018;
- No. TX 8-719-892 for Volume 12 covering 5 collective works and the articles contained therein published in June 2018;
- No. TX 8-681-652 for Volume 12 covering 4 collective works and the articles contained therein published in July 2018;
- No. TX 8-681-637 for Volume 12 covering 5 collective works and the articles contained therein published in August 2018;
- No. TX 8-664-307 for Volume 12 covering 4 collective works and the articles contained therein published in September 2018;
- No. TX 8-731-124 for Volume 12 covering 4 collective works and the articles contained therein published in October 2018;
- No. TX 8-694-333 for Volume 12 covering 4 collective works and the articles contained therein published in November 2018;
- No. TX 8-753-548 for Volume 12 covering 3 collective works and the articles contained therein published in December 2018;
- No. TX 8-748-786 for Volume 13 covering 4 collective works and the articles contained therein published in January 2019;
- No. TX 8-748-854 for Volume 13 covering 4 collective works and the articles contained therein published in February 2019;
- No. TX 8-758-134 for Volume 13 covering 5 collective works and the articles contained therein published in March 2019;
- No. TX 8-714-974 for Volume 13 covering 4 collective works and the articles contained therein published in April 2019;
- No. TX 8-807-598 for Volume 13 covering 5 collective works and the articles contained therein published in May 2019;
- No. TX 8-815-920 for Volume 13 covering 4 collective works and the articles contained therein published in June 2019;
- No. TX 8-821-888 for Volume 13 covering 4 collective works and the articles contained therein published in July 2019;
- No. TX 8-846-342 for Volume 13 covering 5 collective works and the articles contained therein published in August 2019;
- No. TX 8-838-978 for Volume 13 covering 4 collective works and the articles contained therein published in September 2019;
- No. TX 8-841-389 for Volume 13 covering 4 collective works and the articles contained therein published in October 2019;
- No. TX 8-842-665 for Volume 13 covering 4 collective works and the articles contained therein published in November 2019;

- No. TX 8-839-002 for Volume 13 covering 4 collective works and the articles contained therein published in December 2019;
- No. TX 8-858-939 for Volume 14 covering 5 collective works and the articles contained therein published in January 2020;
- No. TX 8-858-749 for Volume 14 covering 4 collective works and the articles contained therein published in February 2020;
- No. TX 8-874-913 for Volume 14 covering 4 collective works and the articles contained therein published in March 2020; and
- No. TX 8-876-561 for Volume 14 covering 4 collective works and the articles contained therein published in April 2020.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies the same.

### C.     **The NIW Copyright Notices**

21.     Plaintiffs have complied with the laws pertinent to providing notice of Plaintiffs' copyrights in, and to, the NIW Publications and their other publications. Specifically, Plaintiffs provide copyright notices and warnings on their website, e-mails, articles and publications, including the NIW Publications, so that third parties are aware of Plaintiffs' rights in their publications and works of original authorship (the "Copyright Notice and Warnings"). As a representative example, the Copyright Notice and Warnings contained in the e-mail transmitting the March 15, 2019 Registered NIW Work state:

Copyright © 2019 Energy Intelligence Group, Inc. All rights reserved.

Reproduction or distribution internally or externally in any manner (photostatically, electronically, or via facsimile), including by sharing printed copies, or forwarding or posting on local- and wide-area networks and intranets, or sharing user name and password, is strictly prohibited without appropriate license from Energy Intelligence – Contact customerservice@energyintel.com for more information.

(Exhibit C).

**ANSWER**: Paragraph 21 states a legal conclusion as to which no response is required. To the extent a response is required, Constellation admits that Paragraph 21 quotes certain text that appears in Exhibit C to the Complaint, but it is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 21 and therefore denies the same.

22.     As an additional representative example, the Copyright Notice and Warnings on the front cover of the March 15, 2019 Registered NIW Work specifically state: "Copyright © 2019 Energy Intelligence Group. All rights reserved. Unauthorized access or electronic forwarding, even for internal use, is prohibited." (Exhibit A at 1).

**ANSWER**: Constellation admits that Paragraph 22 quotes certain text that appears on page 1 of Exhibit A to the Complaint. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 22 and therefore denies the same.

23.     As a further representative example, Plaintiffs also use the following Copyright Notice and Warnings in NIW:

> Copyright © 2019 by Energy Intelligence Group, Inc. [. . .] All rights reserved. Access, distribution and reproduction are subject to the terms and conditions of the subscription agreement and/or license with Energy Intelligence. Access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with Energy Intelligence is willful copyright infringement. Additional copies of individual articles may be obtained using the pay-per-article feature offered at www.energyintel.com.

(Exhibit A at 10).

**ANSWER**: Constellation admits that Paragraph 23 quotes certain text that appears on page 10 of Exhibit A to the Complaint. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 23 and therefore denies the same.

24.     Based on these representative examples of the Copyright Notice and Warnings set forth in the NIW Publications, Plaintiffs are in compliance with the copyright notice requirements set forth in the Copyright Act, 17 U.S.C. § 401.

**ANSWER**: Paragraph 24 states a legal conclusion as to which no response is required. To the extent a response is required, Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies the same.

25.     Accordingly, Defendant knew or should have known that the March 15, 2019 Registered NIW Work and all other issues of the NIW Publications received by the Defendant and the articles contained therein were and are protected by U.S. copyright laws.

**ANSWER**: Denied.

26.     The copyright notices appearing conspicuously on multiple materials received by the Defendant, including the NIW Publications, demonstrate Defendant's actual notice of Plaintiffs' copyrights in the Registered NIW Works received by the Defendant and the articles contained therein, all of which are protected by U.S. copyright laws.

**ANSWER**: Denied.

27.     Defendant had constructive knowledge of Plaintiffs' copyrights in the Registered NIW Works based on receiving the Registered NIW Works containing the copyright notices prominently displayed in each of the NIW Publications.

**ANSWER**: Denied.

28.     Having complied with the copyright notice requirements set forth in the Copyright Act, 17 U.S.C. § 401, Plaintiffs have provided Defendant with complete and proper notice of Plaintiffs' copyrights in the Registered NIW Works.

**ANSWER**: Denied.

### D.     <u>Defendant's NIW Subscription History</u>

29.     From at least as early as November 2011 through the present, Defendant has maintained a subscription for two of its employees to each receive a single-copy of NIW and the articles therein by email delivery.

**ANSWER**: Constellation admits that it has subscribed to NIW and has received copies of NIW via email. Constellation denies Plaintiffs' apparent interpretation of the terms of those subscriptions and therefore denies the remainder of the allegations in Paragraph 29.

30.     One of the recipients of NIW, Mr. Kenneth Petersen, Vice President, Nuclear Fuels has been a designated recipient of NIW since November 9, 2011.

**ANSWER**: Constellation admits that Mr. Peterson has received at least some copies of NIW since November 9, 2011. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 30 and therefore denies the same.

31.     On November 20, 2019, Defendant most recently renewed its subscription for Mr. Petersen and one other individual to each receive a single-copy of NIW via email delivery for a one-year period, which will expire on November 18, 2020.

**ANSWER**: Constellation admits that it renewed its subscription of NIW in 2019.

Constellation denies Plaintiffs' apparent interpretation of the terms of those subscriptions and

therefore denies the remainder of the allegations in Paragraph 31.

32.     From at least as early as 2011 through the present, Plaintiffs transmitted to Defendant invoices and/or subscription agreements on an annual basis for the renewal of its subscription to NIW (the "NIW Agreements"). By way of example, the invoice and subscription agreement for Defendant's two-copy license to NIW, which was in effect on March 15, 2019 (the "2018-2019 NIW Agreement"), specifically states that:

> By payment of this invoice and/or use of EIG Services, you hereby
> acknowledge receipt, review and acceptance of Energy Intelligence's terms
> and conditions shown on the reverse side of this invoice.

A copy of the invoice and subscription agreement are annexed hereto as Exhibit D.

**ANSWER**: Constellation admits that Plaintiffs periodically transmitted invoices to

Constellation. Constellation admits that Exhibit D appears to be a copy of an invoice covering the

2018–2019 period that contains the language quoted in Paragraph 32. Constellation denies

Plaintiffs' apparent interpretation of the terms of Constellation's subscription agreements.

Constellation is without knowledge or information sufficient to form a belief as to the truth of the

remainder of the allegations in Paragraph 32 and therefore denies the same.

33.     The 2018-2019 NIW Agreement further states in part that:

> [a]ll unauthorized reproductions, or disseminations or other uses of material
> contained in the EIG Services shall be deemed willful infringement of EIG's
> copyright and/or other proprietary and intellectual property rights.

**ANSWER**: Constellation admits that its subscription agreement covering the 2018–2019

period includes the text quoted in Paragraph 33. Constellation denies that the allegations in

Paragraph 33 fully or accurately summarize the terms of the agreement and denies any characterization or interpretation that is inconsistent therewith.

34.     Defendant has accepted the terms of the NIW Agreements as well as the subscription services provided by Plaintiffs under the NIW Agreements.

**ANSWER**: Constellation admits that it entered into subscription agreements concerning NIW and has received copies of NIW via email. Constellation denies Plaintiffs' apparent interpretation of the terms of those agreements and therefore denies the remainder of the allegations in Paragraph 34.

### E. **Defendant's Infringement of the Registered NIW Works**

35.     Plaintiffs have analyzed data reflecting Defendant's activity on the servers of the third-party email delivery service (the "Delivery Service") that delivers NIW to Defendant. Although neither Plaintiffs nor the Delivery Service have ever accessed Defendant's servers or computer systems, various employees of Defendant have downloaded certain information and images contained in the cover email provided with each issue of NIW from the Delivery Service's servers.

**ANSWER**: Constellation denies that it committed any acts constituting copyright infringement. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 35 and therefore denies the same.

36.     The data from the Delivery Service's servers indicates that the emails delivering NIW were opened multiple times each day, using multiple unique devices. Upon information and belief, Defendant has been copying and distributing copies of the Registered NIW Works to employees of Defendant.

**ANSWER**: Constellation denies that it committed any acts constituting copyright infringement. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 36 and therefore denies the same.

37.     Upon information and belief, the email delivering the March 15, 2019 Registered NIW Work to Kenneth Petersen was opened approximately 102 times on 35 unique devices, in association with multiple copies of NIW and demonstrating that Defendant distributed copies of the March 15, 2019 Registered NIW Work to multiple employees of Defendant.

**ANSWER**: Constellation denies that it committed any acts constituting copyright infringement. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 37 and therefore denies the same.

38.     Upon information and belief, between July 20, 2018 and October 18, 2019, the approximately 65 emails delivering NIW to Kenneth Petersen during that period were opened 880 times on 159 unique devices by various employees of Defendant and/or others, further demonstrating Defendant's copying and distribution of the Registered NIW Works to employees of Defendant and/or others.

**ANSWER**: Constellation denies that it committed any acts constituting copyright infringement. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 38 and therefore denies the same.

39.     Upon information and belief, the unlawful copying and distribution of the Registered NIW Works by Defendant began as least as early as November 10, 2011 and has continued through to the present.

**ANSWER**: Denied.

40.     Upon information and belief, Defendant's email servers, servers, and computer systems are highly secure and only those individuals or entities that Defendant designates may access them.

**ANSWER**: Admitted.

41.     Upon information and belief, Defendant's email servers, servers, and computer systems cannot be accessed by the general public or by Plaintiffs.

**ANSWER**: Admitted.

42.     Upon information and belief, despite notice of the numerous Copyright Notice and Warnings against reproduction and copying and the terms and conditions of Defendant 's subscriptions to NIW, Defendant has been making copies of the Registered NIW Works, and the articles contained therein, and forwarding or otherwise distributing the same, all in violation of Plaintiffs' copyrights in the Registered NIW Works.

**ANSWER**: Denied.

43.     Plaintiffs have never authorized Defendant to copy, transmit, or distribute the Registered NIW Works in a manner exceeding the scope of its subscription licenses.

**ANSWER**: Denied.

44. Upon information and belief, Defendant actively and willfully infringed Plaintiffs' registered copyrighted works and concealed its regular and systematic copying and forwarding of the Registered NIW Works, and the articles contained therein, from Plaintiffs.

**ANSWER**: Denied.

45. By unlawfully copying, transmitting and distributing the Registered NIW Works, Defendant has, and is, violating Plaintiffs' exclusive rights to reproduce and distribute the Registered NIW Works.

**ANSWER**: Denied.

46. Upon information and belief, Defendant's acts of copying and distributing the Registered NIW Works constitute willful infringement of Plaintiffs' Registered NIW Works.

**ANSWER**: Denied.

## <u>COUNT ONE</u>

## <u>(INFRINGEMENT OF THE REGISTERED NIW WORKS)</u>

47. Plaintiffs repeat and reallege the allegations of Paragraphs 1-46 as though fully set forth herein.

**ANSWER**: Constellation realleges and incorporates by reference its answers to Paragraphs 1 through 46 as though fully set forth herein.

48. The Registered NIW Works are highly original and contain creative expression and independent analysis. The individual works comprising the Registered NIW Works are original works copyrightable under 17 U.S.C. § 102(a).

**ANSWER**: Constellation denies the allegations in the first sentence of Paragraph 48. Constellation is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 48 and therefore denies the same.

49. Plaintiffs owns all right, title, and interest in and to the Registered NIW Works and are the owners of valid copyright registrations for the Registered NIW Works. *See* Exhibit B.

**ANSWER**: Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies the same.

50. As the owner of the Registered NIW Works, Plaintiffs have the exclusive right to reproduce the Registered NIW Works and distribute copies of the Registered NIW Works pursuant to Section 106 of the Copyright Act, 17 U.S.C. § 106.

**ANSWER**: Paragraph 50 states a legal conclusion as to which no response is required. To the extent a response is required, Constellation is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies the same.

51. Copies of the Registered NIW Works were made available to and were received by Defendant pursuant to subscription agreements for a two-copy license to NIW.

**ANSWER**: Denied.

52. Upon information and belief, Defendant has for years willfully copied and distributed the Registered NIW Works on a consistent and systematic basis, without Plaintiffs' authorization or consent, and concealed these activities from Plaintiffs.

**ANSWER**: Denied.

53. Based on the inclusion of the Copyright Notice and Warnings contained in each of Plaintiffs' publications, in the language in the subscription agreements, including the Registered NIW Works, in the language of the subscription agreements, in the transmittal cover emails delivering the NIW publications to Defendant, and on Plaintiffs' website, Defendant knew and/or was on notice that the Registered NIW Works were and are protected by the copyright laws, and Defendant is therefore unable to assert a defense of innocent infringement. *See* 17 U.S.C. § 401(d).

**ANSWER**: Paragraph 53 states a legal conclusion as to which no response is required. To the extent a response is required, Constellation denies that the allegations in Paragraph 53 fully or accurately summarize the terms of Constellation's subscription agreements, denies any characterization or interpretation that is inconsistent therewith, and denies the remainder of the allegations in Paragraph 53.

54. Defendant's subscription agreements for a two-copy license to NIW, and U.S. copyright law, prohibit copying and distributing of the Registered NIW Works. 17 U.S.C. § 501(a).

**ANSWER**: Paragraph 54 states a legal conclusion as to which no response is required. To the extent a response is required, Constellation denies that the allegations in Paragraph 54 fully or accurately summarize the terms of Constellation's subscription agreements, denies any

characterization or interpretation that is inconsistent therewith, and denies the remainder of the

allegations in Paragraph 54.

55.    Upon information and belief, Defendant willfully infringed the copyrights in the
Registered NIW Works by acting with knowledge that its actions constituted infringement, or at
least with reckless disregard of the possibility that the conduct complained about constitutes
infringement.

**ANSWER**: Denied.

56.    Defendant's acts violate Plaintiffs' exclusive rights under § 106 of the Copyright
Act of 1976, 17 U.S.C. § 106, as amended, and constitute willful infringement of Plaintiffs'
copyrights in the Registered NIW Works. Defendant's past and continuing copying, transmitting,
and distribution of Plaintiffs' Registered NIW Works constitute a willful, deliberate, and ongoing
infringement of Plaintiffs' copyrights and are causing irreparable harm and damage to Plaintiffs.

**ANSWER**: Denied.

57.    Plaintiffs have no adequate remedy at law.

**ANSWER**: Constellation denies that Plaintiffs are entitled to any remedy whatsoever. To

the extent Plaintiffs are entitled to a remedy, Constellation denies that Plaintiffs have no adequate

remedy at law.

## JURY DEMAND

Constellation hereby demands a trial by jury on all issues so triable.

## RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF

Constellation denies that Plaintiffs are entitled to any relief whatsoever from

Constellation, including without limitation the relief requested in the Complaint's Prayer for

Judgment and Relief.

## AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, and specifically reserving

the right to assert additional affirmative defenses as additional information becomes available

through discovery or otherwise, Constellation asserts the following affirmative defenses:

20

## FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

1.      At least a portion of Constellation's alleged infringing conduct occurred more than three years before the commencement of this action. Plaintiffs discovered, or with due diligence should have discovered, at least a portion of the alleged infringing conduct more than three years before the commencement of this action. For example, Plaintiffs specifically identify U.S. Copyright Registration No. TX 7-617-881 in their Complaint for Copyright Infringement. The issues of NIW corresponding to such registration were published and transmitted to Constellation in 2011. Plaintiffs regularly analyzed data reflecting Constellation's activity on the servers of a third-party email delivery service, and yet Plaintiffs did not initiate this action until July 2020.

2.      Plaintiffs' claim is barred in whole or in part by 17 U.S.C. § 507(b).

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

3.      Plaintiffs knew, or with due diligence should have known, of the allegedly infringing conduct years before the commencement of this action. Plaintiffs failed to bring suit within a reasonable time. For example, Plaintiffs specifically identify U.S. Copyright Registration No. TX 7-617-881 in their Complaint for Copyright Infringement. The issues of NIW corresponding to such registration were published and transmitted to Constellation in 2011. Plaintiffs regularly analyzed data reflecting Constellation's activity on the servers of a third-party email delivery service, and yet Plaintiffs did not initiate this action until July 2020.

4.      Constellation has been prejudiced by Plaintiffs' unreasonable delay, as the passage of time will make collection of evidence rebutting Plaintiffs' claims more difficult or impossible.

5.      Plaintiffs' claim is barred by the doctrine of laches.

### THIRD AFFIRMATIVE DEFENSE
### (License)

6.      Constellation's alleged infringing conduct was explicitly or implicitly licensed or otherwise authorized by Plaintiffs. For example, the relevant licensing agreement states that "EIG Services may be accessed and/or used solely by the individual(s) expressly named on this invoice under the 'Shipped to' notation." Such notation identifies Exelon Generation Co. (Constellation's former name).

7.      Plaintiffs' claim is barred by an explicit or implicit license. Plaintiffs' claim also contests the scope of said license and seeks to enforce a condition subsequent and therefore only gives rise to a breach of contract claim, at most, not a copyright infringement claim.

### FOURTH AFFIRMATIVE DEFENSE
### (Copyright Misuse)

8.      Plaintiffs have engaged in acts that wrongfully attempted to extend the scope of the limited monopoly granted by the Copyright Act.

9.      On information and belief, Plaintiffs deliberately registered at least some Registered NIW Works as works for hire when they were not. For example, Plaintiffs alleged that they have reporters, editors, and analysts who create *NIW* articles, but they do not allege for each Registered *NIW* Work that such creators are employees acting within the scope of their employment or contractors whose written agreements appropriately designated their work as a work made for hire.

10.      Plaintiffs have also claimed infringement and damages beyond that to which they are entitled, and they have included terms in agreements that unreasonably and unlawfully attempt to restrict a recipient's use or retention of authorized copies.

11.      Constellation incorporates the paragraphs of its Counterclaims.

12.      Plaintiffs' claim is barred by the doctrine of copyright misuse.

22

**FIFTH AFFIRMATIVE DEFENSE**
**(Unavailability of Damages)**

13.     Plaintiffs are barred from claiming statutory damages or attorney's fees under that statute for all alleged acts of infringement occurring sufficiently before registration of the allegedly infringed Registered *NIW* Work pursuant to 17 U.S.C. § 412.

**SIXTH AFFIRMATIVE DEFENSE**
**(Failure to Mitigate Damages)**

14.     On information and belief, including Plaintiffs' allegations of monitoring Constellation's use of Registered *NIW* Works, Plaintiffs knew of the allegedly infringing conduct years before the commencement of this action, yet they took no steps to reduce or avoid the alleged damages.

15.     Plaintiffs' claim is barred, in whole or in part, because Plaintiffs made no attempt to mitigate their claimed damages.

**SEVENTH AFFIRMATIVE DEFENSE**
**(First Sale)**

16.     To the extent Plaintiffs' Complaint alleges that a person who lawfully purchased a copy of a Registered *NIW* Work committed infringement by lending or giving away the copy, Plaintiffs' claim is barred under the first sale or exhaustion doctrine.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Unclean hands)**

17.     Plaintiffs' business model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications.

18.     Constellation incorporates the paragraphs of its Counterclaims.

19.     Plaintiffs' claim is barred under the doctrine of unclean hands.

### NINTH AFFIRMATIVE DEFENSE
### (Fraud)

20.     Plaintiffs market themselves to customers, including Constellation, as a business engaged in publishing informational newsletters for the global energy industry, when in fact their true business—and the source of nearly all their profits—is entrapping them into allegedly infringing activity and copyright litigation.

21.     Constellation incorporates the paragraphs of its Counterclaims.

22.     Plaintiffs' claim is barred due to their fraud.

## COUNTERCLAIMS

Counterclaim Plaintiff Constellation Energy Generation, LLC, for its Counterclaims against Counterclaim Defendants Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited, alleges as follows:

## PARTIES

1.     Counterclaim Plaintiff Constellation Energy Generation, LLC ("Constellation") is a Pennsylvania limited liability company with its headquarters in Kennett Square, Pennsylvania.

2.     Counterclaim Defendant Energy Intelligence Group, Inc. ("EIG, Inc.") is a Delaware corporation with its principal place of business in New York, New York 10016.

3.     Counterclaim Defendant Energy Intelligence Group (UK) Limited ("EIG UK" and, together with EIG, Inc., the "Counterclaim Defendants" or "EIG") is a United Kingdom limited company with its principal place of business in London, United Kingdom.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over EIG's claims under the Copyright Act pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Constellation's Counterclaims

pursuant to 28 U.S.C. § 1367 because the Counterclaims are so related that they form part of the same case or controversy.

5.       The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the Counterclaims are an action between a citizen of the Commonwealth of Pennsylvania (Constellation), on the one hand, and a citizen of the States of New York and Delaware (EIG, Inc.) and a subject of a foreign state (EIG UK), on the other, and the amount in controversy exceeds $75,000.

6.       This Court has personal jurisdiction over EIG, Inc. and EIG UK because they consented to jurisdiction by filing the original Complaint (ECF No. 1) in this action.

7.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## **FACTUAL ALLEGATIONS**

###   **A.   Introduction.**

8.       Constellation is one of the largest, most efficient clean energy producers in the United States. Constellation's fleet has a generating capacity of more than 30,000 megawatts, enough to power more than 20 million homes and businesses. Constellation is America's leading provider of zero-carbon nuclear energy, operating zero-carbon nuclear plants with more than 18,700 megawatts from 21 reactors at 12 facilities in Illinois, Maryland, New York, and Pennsylvania. Constellation also operates a diverse mix of wind, solar, hydroelectric, natural gas and oil facilities, in 17 states and Canada, that provide nearly 12,000 megawatts of safe, efficient energy.

9.       EIG purports to be a business engaged in publishing informational newsletters for the global energy industry. Constellation has paid for and subscribed to one of those publications, *Nuclear Intelligence Weekly* ("*NIW*") (formerly called *Uranium Intelligence Weekly*), since that publication's inception in 2007. During that period, Constellation employees regularly contributed

to *NIW*, such as by sharing industry-related information and providing comments and corrections on published issues. EIG then incorporated this information and feedback into its publications.

10.     Constellation's employees who interacted with EIG with respect to Constellation's annual subscriptions to *NIW* are or were located at Constellation's regional headquarters in Warrenville, Illinois. EIG's subscription agreements and invoices for *NIW* were sent to Constellation's regional headquarters in Warrenville, Illinois.

11.     As Constellation has only recently become aware, however, EIG's business model is based on a false pretense of luring customers into subscription agreements, intentionally deceiving them as to what EIG deems unauthorized use of the publications in the subscription agreements, entrapping them into allegedly infringing activity and copyright litigation, and then extorting massive settlements and licenses that have no relationship to the cost of EIG's subscription or the actual value of EIG's publications. Specifically, Constellation spent less than $10,000 per year on its subscription with EIG, and EIG now brings this lawsuit—and the others EIG files against other customers—for the purpose of extracting amounts far above this cost and the actual value of the publications.

12.     Since 2005, one or both of EIG, Inc. and EIG UK have brought more than 75 federal copyright infringement suits similar to EIG's suit here against Constellation. EIG's copyright infringement lawsuits against its customers have accounted for the vast majority of EIG's profits for more than a decade and have generated revenues on the order of a hundred million dollars. Indeed, EIG offers bonuses to employees who create copyright litigation against customers, with another bonus if the lawsuit leads to a monetary recovery for EIG.

**B.      EIG's Scheme to Increase Its Revenue by Intentionally Entrapping and Aggressively Pursuing Copyright Litigation Against Its Customers.**

13.     In 2005, EIG—which was just breaking even—decided that its subscription-based business was insufficiently profitable in the digital era. *EIG v. Kayne Anderson*, No. 4:14-cv-01903

(S.D. Tex. Apr. 7, 2017) ("*Kayne Anderson*"), ECF No. 171-22 at EIGvKayne037705–06; *id.* at ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 195:13–21).

14.     To address this problem, EIG settled on a strategy of intentionally entrapping its customers into allegedly infringing activity and aggressively pursuing copyright litigation against them as a way to generate additional revenue and profits. *Kayne Anderson*, ECF No. 171-22.

14.     To accomplish this scheme, EIG would lure unwitting customers into subscription agreements, aggressively and covertly track their activity, entrap them into allegedly infringing activity and copyright litigation, and then extract massive windfall settlements and licenses not rationally tied to the conduct at issue. EIG's ownership and board of directors signed off on this strategy. *Kayne Anderson*, ECF No. 171-21.

15.     In furtherance of this scheme, EIG intentionally worded their subscription agreements to deliberately mislead Constellation and other customers as to what EIG may deem to be unauthorized use of its publications. (*See infra* § C–D.)

16.     A 2007 email from EIG's Vice President of Sales and Marketing, Mark Hoff, to George King, EIG's Chief Financial Officer, summarized the scheme: "[W]e are . . . defending our 'old' model in 2 ways: 1) suing our clients and 2) leveraging copyright abuse cases with negotiated commercial deals . . . . Mark [Wellman] supervises the first strategy; I supervise the second. It's clear from the board meeting that Mark's stated goal is to aggressively pursue the rest of our large clients with lawsuits, and in this appears to have the support of board and ownership." *Kayne Anderson*, ECF No. 171-21. Mr. Hoff explicitly noted that the first strategy—suing EIG's clients— included "*random entrapment efforts* led by Mark." *Id.* (emphasis added).

17.     EIG's scheme to increase its revenues by intentionally entrapping its customers into allegedly infringing activity and aggressively pursuing copyright litigation against them was far more profitable than merely selling subscriptions. Between 2008 and 2009, for example, EIG's

revenue declined 7% when revenue from copyright litigation was excluded but increased 27% when copyright litigation was included. *Kayne Anderson*, ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 223:19-224:7); *Kayne Anderson*, ECF No. 171-34 at EIGvKayne039285.

18.     In 2009, an internal EIG Sales and Marketing report disclosed that EIG's sales program now included "aggressive tracking of clients suspected of copyright abuse and systematic application of copyright protection software and other detection methods." *Kayne Anderson*, ECF No. 171-34 at EIGvKayne039285.

19.     In 2010, EIG "ratchet[ed] up" its efforts even further. *Kayne Anderson*, ECF No. 171-20 (Dep. Tr. of Mark Hoff at 103:5-104:6).

20.     EIG began offering a $5,000 bonus to employees who create potential opportunities for copyright litigation, with an additional $5,000 if the lawsuit leads to a monetary recovery for EIG. *Kayne Anderson*, ECF No. 171-16 (Dep. Tr. of Deborah Brown at 77:10-16); *id.* ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 77:1-78:14); *id.* ECF No. 171-20 (Dep. Tr. of Mark Hoff at 108:19-109:21).

21.     EIG also has staff dedicated to managing its copyright litigation scheme. *Kayne Anderson*, ECF No. 171-14 (Dep. Tr. of Mark Wellman at 7:6-8:18). This staff is handsomely compensated with a percentage of the cash EIG receives from its copyright litigation scheme. *Kayne Anderson*, ECF No. 171-29; *id.* at ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 217:10-17).

22.     In one year, EIG paid Mark Wellman more than $1 million in commissions based solely on his management of EIG's copyright litigation scheme. *Kayne Anderson*, ECF No. 171-24 at EIGvKayne002097, EIGvKayne002120; *id.* ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 246:6-18).

23. EIG's compensation and bonus structure leaves little incentive for EIG to prevent copying on any level, correct its customers' misapprehensions regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights, or give notice to customers about potential infringement.

24. EIG's copyright litigation scheme has been wildly successful, allowing EIG to increase its profits even while its subscription business was declining. Between August 2011 and January 2013, for example, EIG lost 400 single-subscriber accounts. *Kayne Anderson*, ECF No. 171-19. Revenue from EIG's copyright litigation scheme, however, allowed EIG to remain profitable. Indeed, for the period from 2005 through 2013, copyright litigation accounted for about *94% of EIG's profits*. *Kayne Anderson*, ECF No. 171-22.

25. EIG intentionally kept its copyright litigation scheme secret from its customers, including Constellation. EIG's website instead markets EIG as "the leading energy information company" that has "delivered objective reporting and analysis on the sector for over 70 years." EnergyIntel.com, *About Us Overview*, available at https://www.energyintel.com/about-us-overview (last visited April 6, 2022).

**C.**      **EIG Misleads Its Customers as to What Is Permissible Use or Whether EIG Would Take Steps to Enforce Its Alleged Rights.**

26. EIG's written subscription agreements are deliberately confusing and tell half-truths in order to mislead customers like Constellation as to what is (and is not) permissible use or whether EIG would (or would not) take steps to enforce its alleged rights.

27. For the period between November 14, 2013 and November 18, 2018, Section 1(c) of each of the annual subscription agreements that EIG provided to Constellation (the "2013–18 Standard Licensing Agreements") provided: "Authorized Users may *occasionally distribute* a copy of a story from the EI Services to *a few individuals, and in a non-systematic manner* in the ordinary course of business, provided the copyright and other proprietary rights notices are included and that

29

Subscriber and/or Authorized User does not edit, alter or abridge the content from the EI Services." *See*, *e.g.*, Standard License Agreement Order Form and Standard License Agreement for November 14, 2013, through November 13, 2014 § 1(c) (emphasis added).

28.      Section 1(c) of the 2013–18 Standard Licensing Agreements stated that "Authorized Users *may download* the licensed EI Services only for their respective individual referential use." *Id.* (emphasis added).

29.      Section 1(c) of the 2013–18 Standard Licensing Agreements also stated, "*Except as otherwise noted in this Section l(c)*, no content from the EI Services may be downloaded, transmitted, broadcast, transferred, assigned, reproduced or in any other way used or disseminated in any form, to any person not specifically identified herein as an Authorized User, without the explicit written consent of Energy Intelligence in each instance." *Id.* (emphasis added). As noted above, Section 1(c) *permits* occasional and non-systematic forwarding of the subscription content and downloading for individual referential use. *Id.*

30.      Sections 1(d) and 4(b) of the 2013–18 Standard Licensing Agreements provided for suspension of access and termination of the 2013–18 Standard Licensing Agreements in connection with infringement, as well as specific notice and cure provisions on a material breach, such as alleged infringement. *Id.* §§ 1(d), 4(b).

31.      Section 10(b) of the 2013–18 Standard Licensing Agreements also represented that "[t]his Agreement contains the *entire understanding* of the parties." *Id.* at 10(b) (emphasis added). This "entire understanding" purported to be the whole truth and disclose EIG's terms, but it did not reveal EIG's true intentions as explained above.

32.      In addition, for the period between November 19, 2018 and November 18, 2020, the subscription agreement that EIG provided to Constellation (the "2018–20 Standard Licensing Agreements") stated that "EIG Services may be accessed and/or used solely by the individual(s)

expressly named on this invoice under the 'Shipped to' notation ('Authorized User(s)')" and also

stated that an Authorized User "can only be a living individual and never a company, organization

or any other entity," but did not in fact identify *any* "individual" under the invoice's "Ship To"

notation. Instead, EIG chose to identify Exelon (Constellation's previous name) on the invoice

under the "Ship To" notation. *See* Sales Order and Subscription Agreement for November 19, 2018,

through November 18, 2019, ECF No. 1-4 at 4.

33.    2018–20 Standard Licensing Agreements also provided that "this Agreement

and/or any EIG Services may be terminated by EIG in the event that Subscriber breaches any of the

terms hereof." *Id.*

34.    The 2018–20 Standard Licensing Agreements further represented that the 2018–20

Standard Licensing Agreements "contain[] the *complete* and exclusive agreement between you,

Authorized User(s) and EIG for the EIG Services." *Id.* (emphasis added). Again, this "complete"

agreement purported to be the whole truth and disclose EIG's terms, but it did not reveal EIG's true

intentions as explained above.

35.    EIG then compounded its misleading subscription agreements—including for the

allegedly infringing activity here—by including a written notice in some of the emails by which

EIG transmitted its registered works: "reproduction or distribution internally or externally *in any*

*manner* . . . including by . . . forwarding . . . is strictly prohibited," ECF No. 1, Compl. ¶ 21

(emphasis added), although this materially contradicted the 2013–18 Standard Licensing

Agreements and 2018–20 Standard Licensing Agreements.

36.    EIG also maintained internal "unwritten" copyright policies that materially differed

from the 2013–18 Standard Licensing Agreements and 2018–20 Standard Licensing Agreements.

For example, EIG's former President, Tom Wallin, swore under oath that EIG had a "long-

standing," "unwritten" policy allowing administrative assistants to forward publications. EIG

admits that "it's not permitted under this contract[,] but *we don't enforce violations*." *Kayne Anderson*, ECF No. 171-12 (Dep. Tr. of Thomas Wallin at 69:4–15, 71:18-72:12) (emphasis added).

37.     EIG thus deliberately misled and told half-truths—including in the 2013–18 Standard Licensing Agreements and the 2018–20 Standard Licensing Agreements—while omitting EIG's true intentions as explained above.

**D.      EIG Intentionally Fails to Correct Its Customers' Misapprehension Whether Activities Were Permitted Use or Whether EIG Would Take Steps to Enforce Its Alleged Rights.**

38.     As a result of EIG's deceptive conduct—in written and spoken word, as well as its silence—Constellation and other customers reasonably believed that allegedly infringing activity was permitted use or that EIG would not take steps to enforce its alleged rights. EIG had a duty to speak to correct this misapprehension because EIG's actions contributed to the misapprehension, and EIG intentionally failed to correct the misapprehension.

39.     EIG also had a duty to speak because EIG possessed unique and superior knowledge that was not readily available to Constellation and other customers about EIG's true intentions, which placed EIG in a position of influence and superiority over Constellation and other customers. EIG's superior knowledge of material undisclosed facts rendered its nondisclosure inherently unfair because Constellation and other customers were unaware of EIG's true intentions and desire to entrap and extort Constellation and other customers.

40.     EIG's silence—for years—in the presence of misleading subscription agreements and statements, specifically concerning material information about permitted use that customers like Constellation reasonably would expect was important, was deceptive conduct such that EIG had a duty to speak to correct the misapprehension.

41.     EIG's years of silence with Constellation and other customers, accompanied by its deceptive conduct and active concealment of its broader scheme, was intended to induce a false belief that allegedly infringing activity was permitted use or that EIG would not take steps to enforce its alleged rights. EIG deliberately behaved in this way to the advantage of the EIG and the disadvantage of Constellation and other customers.

42.     EIG is not interested in simply recouping its actual alleged damages or protecting its alleged copyrights by correcting its customers' misapprehensions and alerting its customers to allegedly infringing activities so that the customers can take steps to address the alleged violations, including the allegedly infringing activity in this lawsuit against Constellation. EIG *wants* its customers to commit alleged infringement so that it can lie in wait and blindside them with a lawsuit for tens of millions of dollars and pay incentives to its employees for entrapping customers into allegedly infringing activity and aggressively pursuing copyright litigation against them, even when its claimed damages are not remotely related to the cost of EIG's subscription or the actual value of EIG's publications.

**D.     EIG Tracks Its Customers' Use of Its Publications to Entrap Them and Extort Large Settlements.**

43.     In furtherance of its scheme, EIG also engages in substantial tracking efforts of its customers. At least as early as September 2009, EIG instituted efforts to "aggressive[ly]" track its clients using the "systematic application of copyright protection software." *Kayne Anderson*, ECF No. 171-34 at EIGvKayne039285.

44.     EIG's Complaint alleges that EIG analyzes data from an email delivery system that allows EIG to see when a publication is opened multiple times from multiple devices. *See* Compl. ¶ 35. Although EIG's Standard License Agreements with Constellation included a statement that Constellation "consent[ed]" to EIG's "tracking usage of the EI Services, through electronic tracking technology," EIG did not disclose that it was tracking Constellation for the purpose of entrapping

Constellation, and Constellation never consented to any usage of tracking information for improper, fraudulent purposes.

45.    EIG's Complaint also alleges that, as a result of its email tracking, it had actual notice of Constellation's alleged infringement as early as July 20, 2018, but to further its scheme, it delayed filing suit until July 2020 to increase its claimed damages. Compl. ¶ 38. EIG's alleged knowledge extends back to 2011. Compl. ¶ 38.

46.    Despite knowledge of the allegedly infringing activity, EIG did not give notice of breach, suspend access, or terminate under the 2013–18 Standard Licensing Agreements and 2018–20 Standard Licensing Agreements, and indeed actively solicited and renewed the subscriptions with Constellation.

47.    EIG purposely waited until May 2020 to advise Constellation that EIG believed Constellation's employees were violating the subscription agreements and EIG's copyrights, and then it did so by a demand letter that threatened suit and gave Constellation a mere five days to respond.

48.    EIG then filed this lawsuit against Constellation alleging activity, such as occasional and non-systematic forwarding, which did not exceed the scope of the licenses, and for which EIG had never given notice of breach, suspended access, terminated, or taken other steps to enforce its alleged rights under the 2013–18 Standard Licensing Agreements and 2018–20 Standard Licensing Agreements.

49.    EIG's silence for years—coupled with its deceptive conduct and substantial tracking efforts—furthered EIG's scheme to deceive Constellation and other customers about whether allegedly infringing activity was permitted use or whether EIG would take steps to enforce its alleged rights. The only rational explanation for EIG's silence was that EIG wanted to entrap Constellation and increase the potential windfall through copyright litigation.

F. **Constellation Relied on EIG's Deceptive Acts and Practice, Frauds, and Unfair Acts and Practices, and Has Been Damaged as a Result.**

50.     EIG intentionally omitted the material information described above in its dealings with Constellation, including in its subscription agreements, invoices, and communications sent to Constellation regarding subscriptions to *NIW* on or around, but not limited to, the following dates: September 6, 2013; September 25, 2013; December 19, 2014; October 28, 2015; December 1, 2016; December 9, 2016; October 17, 2017; November 6, 2017; November 19, 2018; November 20, 2018; November 19, 2019; November 20, 2019; and November 25, 2019.

51.     On or around each of these dates—even after EIG allegedly had evidence of the allegedly infringing activity—EIG's representatives corresponded with Constellation to sell subscriptions to *NIW* and failed to disclose the material information described above.

52.     EIG's misrepresentations and omissions were made by EIG sales representatives, as well as the EIG employees responsible for managing its copyright litigation scheme, including Mark Hoff, Brian Bowman, Dan Horner, and Derrick Dent. EIG's employees such as Derrick Dent also have been involved in entrapping other EIG customers, demonstrating a systemic plan to manufacture alleged copyright infringement.

53.     EIG, including its editors and reporters, such as Philip Chaffee and Jessica Reyes Sondgeroth, also regularly solicited information from Constellation for EIG's publications and failed to disclose the material information. EIG's employees have contacted Constellation's employees via work email accounts. When those communications were blocked by Constellation after the initiation of this litigation, EIG's employees then reached out to the Constellation employees' personal accounts, including the Constellation employees' LinkedIn accounts. Even during this litigation, EIG's employees have attempted to contact represented Constellation employees by emails, phone calls, and voicemails. In each case, EIG still failed to disclose the material information.

35

54.     Specifically, EIG contacted Constellation's employees for pricing information concerning uranium. Those emails stated, in pertinent part, "we rely on honest and realistic price assessments" from panel members, including Constellation, to "fulfill our commitment . . . to our readers[.]" In one email, Philip Chaffee noted that EIG has been using Constellation's information ever since EIG launched the price panel in 2007, and that they would "hate to lose [Constellation] as a participant." EIG touts that information from key industry leaders, including Constellation, helped EIG "fulfill [its] commitment" to its readers to provide such information.

55.     Had Constellation known the material information that EIG concealed, suppressed, and omitted, Constellation would not have paid for and entered into the subscription agreements, would not have shared valuable industry-related information and provided valuable comments and corrections to EIG for its publications, including *NIW*, and would have blocked EIG's communications.

###     G.     EIG's Unfair Acts and Practices Offend Public Policy, Are Oppressive and Unscrupulous, and Cause Substantial Injury to Customers.

56.     As noted above, the material information that EIG concealed, suppressed, and omitted is exactly the type of information upon which a buyer of EIG's services would be expected to rely in deciding whether to conduct trade or commerce with EIG.

57.     EIG's acts and practices were inherently unfair because Constellation and other customers are unaware of EIG's true intent and desire to entrap and extort Constellation and other customers. EIG lures Constellation and other customers into subscriptions agreements that allow them to share EIG's publications and download copies in certain circumstances, actively tracks this usage, but waits years to notify its customers of any alleged infringement, finally entrapping them in copyright litigation to extort windfall settlements and licenses from its customers.

58.     EIG's acts and practices also impose an unfair burden on Constellation and other customers. The 2013–18 Standard Licensing Agreements and 2018–20 Standard Licensing

Agreements stated that they are the "entire understanding" and "complete" terms, yet EIG's emails sending its publications claim that "reproduction or distribution internally or externally *in any manner* . . . including by . . . forwarding . . . is strictly prohibited" and sues based on this allegedly infringing activity. In light of these requirements, and since *NIW* is published weekly, Constellation and other customers would have to expend enormous resources to determine whether they were complying with the terms.

59.      EIG's acts and practices have caused substantial injury to Constellation and other consumers. In 2005, EIG estimated that, on average, it could earn $100,000 from settling a single copyright infringement action. *Kayne Anderson*, ECF No. 171-22 at EIGvKayne037706. Since 2005, EIG has filed over 75 copyright infringement suits. Based on EIG's own estimates, EIG has far surpassed its initial estimates and extracted on the order of a hundred million dollars from its customers.

60.      Constellation and other consumers could not reasonably have avoided this substantial injury because EIG intentionally fails to correct consumers' misapprehension regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights. EIG does not give notice of breach, suspend access, or terminate, and instead intentionally entraps its customers into allegedly infringing activity and aggressively pursues copyright litigation against them.

61.      EIG's unfair acts and practices also have deprived Constellation and other customers of a meaningful choice because EIG entraps and funnels them into copyright litigation that they must pay to defend against. Beyond this lawsuit, EIG has sued customers for which EIG later determined "there was no copyright infringement" and "terminated [the litigation] on advice of counsel." *Kayne Anderson*, ECF No. 171-12 at 120:18–22, 122:4.

62.     In 2010, for example, EIG sued its customer and alleged its customer "was forwarding Natural Gas Weekly regularly and systematically at least as early as 2001 and possibly as early as 1995 up until the date of the complaint in 2010," but later admitted "the number of recipients [the customer] was sending unauthorized copies of EIG publications to" was "zero." *Kayne Anderson*, ECF No. 171-12 at 177:24–178:24.

63.     In 2013, EIG sued another customer and alleged that customer was regularly and systematically forwarding and distributing copies of *Oil Daily*, but later admitted "there was no copyright infringement." *Kayne Anderson*, ECF No. 171-12 at 118:20–120:19.

64.     In 2014, EIG sued yet another customer and alleged that customer was regularly and systematically forwarding and distributing copies of *Oil Daily*, but later admitted "we had no information before that litigation" and the lawsuit was "terminated on advice of counsel." *Kayne Anderson*, ECF No. 171-12 at 121:19–122:22.

65.     While consumers are defending against EIG's copyright infringement claims, EIG then uses this as "leverage" to force consumers to enter into expensive, new, multi-year, enterprise-wide license agreements to access EIG's publications, regardless of whether those publications are relevant. EIG charges consumers *over 70 times more* for those licenses than what consumers had initially signed up to pay.

66.     EIG's unfair acts and practices thus offend public policy, are oppressive and unscrupulous, and cause substantial injury to customers as evidenced by the allegations above, including EIG's own internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

## COUNT ONE
## (DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF
## THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
## BUSINESS PRACTICES ACT)

67.     Constellation re-alleges and incorporates Paragraphs 1 through 66 of the Counterclaims.

68.     EIG committed deceptive acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS § 505/1, et seq.), including that (1) EIG intends to entrap its customers into allegedly infringing activity and copyright litigation, (2) EIG's business model uses a false pretense of entrapping and suing its customers in copyright litigation, (3) EIG seeks to aggressively accuse its customers of copyright violations, (4) EIG seeks to extort windfall settlements and licenses from its customers, (5) EIG incentivizes its employees to induce allegedly infringing activity and copyright litigation by paying up to $10,000 bonuses, (6) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (7) EIG derives nearly all of its profits from copyright litigation, (8) EIG electronically tracks its customers' usage for alleged copyright litigation but waits for years to notify its customers of allegedly infringing activity for the purpose of entrapping them and instituting copyright litigation, and (9) EIG intentionally fails to correct its customers' misapprehension regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights.

69.     EIG intended for Constellation to rely on its deceptive acts and practices.

70.     EIG's deceptive acts and practices occurred during a course of conduct involving trade or commerce in Illinois.

71.     EIG's deceptive acts and practices proximately caused actual damages to Constellation, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

## COUNT TWO
### (UNFAIR ACTS OR PRACTICES IN VIOLATION OF THE
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE
### BUSINESS PRACTICES ACT)

72.     Constellation re-alleges and incorporates Paragraphs 1 through 66 of the Counterclaims.

73.     EIG committed unfair acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS § 505/1, et seq.), including that (1) EIG intends to entrap its customers into allegedly infringing activity and copyright litigation, (2) EIG's business model uses a false pretense of entrapping and suing its customers in copyright litigation, (3) EIG seeks to aggressively accuse its customers of copyright violations, (4) EIG seeks to extort windfall settlements and licenses from its customers, (5) EIG incentivizes its employees to induce allegedly infringing activity and copyright litigation by paying up to $10,000 bonuses, (6) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (7) EIG derives nearly all of its profits from copyright litigation, (8) EIG electronically tracks its customers' usage for alleged copyright litigation but waits for years to notify its customers of allegedly infringing activity for the purpose of entrapping them and instituting copyright litigation, and (9) EIG intentionally fails to correct its customers' misapprehension regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights.

74.     EIG intended for Constellation to rely on its unfair acts and practices.

75.     EIG's unfair acts and practices occurred during a course of conduct involving trade or commerce in Illinois.

76.     EIG's unfair acts and practices proximately caused actual damages to Constellation, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

## COUNT THREE
### (FRAUD)

77.     Constellation re-alleges and incorporates Paragraphs 1 through 66 of the Counterclaim.

78.     EIG made materially false and misleading factual representations to Constellation and knowingly omitted material information from Constellation, including that (1) EIG intends to entrap its customers into allegedly infringing activity and copyright litigation, (2) EIG's business model uses a false pretense of entrapping and suing its customers in copyright litigation, (3) EIG seeks to aggressively accuse its customers of copyright violations, (4) EIG seeks to extort windfall settlements and licenses from its customers, (5) EIG incentivizes its employees to induce allegedly infringing activity and copyright litigation by paying up to $10,000 bonuses, (6) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (7) EIG derives nearly all of its profits from copyright litigation, (8) EIG electronically tracks its customers' usage for alleged copyright litigation but waits for years to notify its customers of allegedly infringing activity for the purpose of entrapping them and instituting copyright litigation, and (9) EIG intentionally fails to correct its customers' misapprehension regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights.

79.     EIG knew or believed at the time such representations were made that they were false and misleading, and that material information was being omitted.

80.     EIG intended to induce Constellation to act on such misrepresentations and material omissions.

81.     Constellation reasonably and justifiably relied on EIG's representations and material omissions. Constellation's reliance included paying for and entering into the subscription agreements and providing industry information to EIG, which Constellation would not have done without EIG's misrepresentations and material omissions.

82. Constellation did not know and could not have known through the exercise of ordinary diligence that EIG's representations were false and misleading or that material information was being omitted.

83. EIG acted with malice, knowledge, willfulness, and intent to defraud as evidenced by the allegations above, including, but not limited to, EIG's internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

84. Constellation has been damaged resulting from the reliance, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

**COUNT FOUR**
**(FRAUD IN THE INDUCEMENT)**

85. Constellation re-alleges and incorporates Paragraphs 1 through 66 of the Counterclaim.

86. EIG knowingly made materially false and misleading factual representations and knowingly omitted material information from Constellation regarding EIG's business and intentions with the intent to defraud and entrap Constellation in a lawsuit.

87. EIG markets itself to customers, including Constellation, as a business engaged in publishing informational newsletters for the global energy industry, when in fact its true business—and the source of nearly all its profits—is entrapping them into allegedly infringing activity and copyright litigation.

88. In its business dealings with Constellation, EIG omitted numerous material facts, including that (1) EIG intends to entrap its customers into allegedly infringing activity and copyright litigation, (2) EIG's business model uses a false pretense of entrapping and suing its customers in copyright litigation, (3) EIG seeks to aggressively accuse its customers of copyright violations, (4) EIG seeks to extort windfall settlements and licenses from its customers, (5) EIG

incentivizes its employees to induce allegedly infringing activity and copyright litigation by paying up to $10,000 bonuses, (6) EIG incentivizes other employees by offering them a cut of any proceeds generated through copyright litigation, (7) EIG derives nearly all of its profits from copyright litigation, (8) EIG electronically tracks its customers' usage for alleged copyright litigation but waits for years to notify its customers of allegedly infringing activity for the purpose of entrapping them and instituting copyright litigation, and (9) EIG intentionally fails to correct its customers' misapprehension regarding whether activities were permitted use or whether EIG would take steps to enforce its alleged rights.

89.     EIG knew or believed at the time such representations were made that they were false and misleading, and that material information was being omitted.

90.     EIG intended to induce Constellation to act on such misrepresentations and material omissions.

91.     Constellation reasonably and justifiably relied on EIG's representations and material omissions. Constellation's reliance included paying for and entering into the subscription agreements and providing industry information to EIG, which Constellation would not have done without EIG's misrepresentations and material omissions.

92.     Constellation did not know and could not have known through the exercise of ordinary diligence that EIG's representations were false and misleading or that material information was being omitted.

93.     EIG acted with malice, knowledge, willfulness, and intent to defraud as evidenced by the allegations above, including, but not limited to, EIG's internal documents, which reference entrapping, tracking, and aggressively pursuing its customers.

94.     Constellation has been damaged resulting from the reliance, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

**COUNT FIVE**
**(BREACH OF CONTRACT AND GOOD FAITH AND FAIR DEALING**
**2013–18 STANDARD LICENSING AGREEMENTS)**

95.     Constellation re-alleges and incorporates Paragraphs 1 through 7 of the Counterclaim.

96.     EIG and Constellation entered into valid and enforceable contracts through the 2013–18 Standard Licensing Agreements.

97.     EIG owed Constellation a duty of good faith and dealing under the 2013–18 Standard Licensing Agreements, including a duty to exercise discretion in good faith, reasonably and with proper motive, and not in a manner inconsistent with the reasonable expectations of Constellation, to disclose material information, and not to take opportunistic advantage of Constellation.

98.     Constellation performed its obligations under the 2013–18 Standard Licensing Agreements.

99.     EIG did not give notice of breach or terminate the 2013–18 Standard Licensing Agreements.

100.     The 2013–18 Standard Licensing Agreements provided that: "Energy Intelligence hereby grants to Subscriber [Constellation] a limited, non-exclusive and non-transferable license, without right of sublicense, to permit Authorized Users to access and use the EI Services, subject to the terms and conditions of this Agreement."

101.     The 2013–18 Standard Licensing Agreements also provided:

When the EI Services are accessed and/or provided electronically, Authorized Users may download the licensed EI Services only for their respective individual referential

44

use. In addition, Authorized Users may occasionally distribute a copy of a story from the EI Services to a few individuals, and in a nonsystematic manner in the ordinary course of business, provided the copyright and other proprietary rights notices are included and that Subscriber and/or Authorized User does not edit, alter or abridge the content from the EI Services. For the avoidance of doubt, no such distribution is permitted if in Energy Intelligence's sole judgment it could serve as a substitute for a subscription to publications and/or the content of the publications within the EI Services. Except as otherwise noted in this Section l(c), no content from the EI Services may be downloaded, transmitted, broadcast, transferred, assigned, reproduced or in any other way used or disseminated in any form, to any person not specifically identified herein as an Authorized User, without the explicit written consent of Energy Intelligence in each instance.

102.    EIG breached these terms and the duty of good faith and dealing.

103.    EIG's breach has caused damages to Constellation, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

**COUNT SIX**
**(BREACH OF CONTRACT AND GOOD FAITH AND FAIR DEALING**
**2018–20 STANDARD LICENSING AGREEMENTS)**

104.    Constellation re-alleges and incorporates Paragraphs 1 through 7 of the Counterclaim.

105.    EIG and Constellation entered into valid and enforceable contracts through the 2018–20 Standard Licensing Agreements.

106.    EIG owed Constellation a duty of good faith and dealing under the 2018–20 Standard Licensing Agreements, including a duty to exercise discretion in good faith, reasonably and with proper motive, and not in a manner inconsistent with the reasonable expectations of Constellation, to disclose material information, and not to take opportunistic advantage of Constellation.

107.    Constellation performed its obligations under the 2018–20 Standard Licensing Agreements.

45

108.    EIG never gave notice of breach or terminated the 2018–20 Standard Licensing Agreements.

109.    The 2018–20 Standard Licensing Agreements provided that "EIG Services may be accessed and/or used solely by the individual(s) expressly named on this invoice under the 'Shipped to' notation ('Authorized User(s)')" and identified Exelon (Constellation's previous name) under the "Ship To" notation.

110.    EIG breached these terms and the duty of good faith and dealing.

111.    EIG's breach has caused damages to Constellation, including the amounts Constellation paid EIG to subscribe to *NIW* and the costs Constellation must now incur in defending against EIG's copyright infringement lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Constellation requests that the Court enter judgment in favor of Constellation and against EIG on each count of the Complaint and Counterclaim, and award the following relief as judgment against EIG:

A.    Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

B.    Punitive damages in an amount to be proven at trial;

C.    An order requiring EIG to disgorge profits obtained as a result of its fraudulent and unfair actions, along with interest;

D.    Constellation's costs and expenses incurred herein, including attorneys' fees; and

E.    Such other relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

Constellation hereby demands a trial by jury on all issues so triable.

Dated: April 13, 2022                    Respectfully submitted,

                                         */s/ Brian O. Watson*
                                         Brian O. Watson
                                         Sondra A. Hemeryck
                                         Louis A. Klapp
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         70 W. Madison, Suite 2900
                                         Chicago, Illinois 60602
                                         Phone: (312) 471-8700
                                         Fax: (312) 471-8701
                                         bwatson@rshc-law.com
                                         shemeryck@rshc-law.com
                                         lklapp@rshc-law.com

                                         *Attorneys for Defendant*
                                         *Constellation Energy Generation, LLC*