IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC, and ENERGY INTELLIGENCE GROUP (UK) LIMITED,<br><br>    Plaintiffs and Counterclaim-Defendants,<br>v.<br><br>CONSTELLATION ENERGY GENERATION, LLC,<br><br>    Defendant and Counterclaim-Plaintiff. | Civil Action No. 1:20–cv–03983<br>Civil Action No. 1:21–cv–05689<br><br>Honorable Joan B. Gottschall<br>Honorable Heather K. McShain |

**CONSTELLATION'S OPPOSITION TO EIG'S MOTION TO COMPEL**

Defendant and Counterclaim-Plaintiff Constellation Energy Generation, LLC ("Constellation") respectfully asks the Court to deny Plaintiffs' Motion to Compel Defendant's Responses to Certain Discovery (Dkt. 110) brought by Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited ("EIG").

## I. BACKGROUND

EIG alleges that Constellation infringed the copyright in all issues of EIG's weekly newsletter *Nuclear Intelligence Weekly* ("*NIW*") from November 2011 through November 2020. (Dkt. 1 ¶¶ 1, 8, 20, 52.) This accusation makes no sense on its face, as it is undisputed that there was a subscription agreement between the parties authorizing Constellation's use of *NIW* for each of the nine yearlong terms covered by the Complaint. (*See id*. ¶¶ 29–32.) Haksoo Kim—who retired from Constellation many years ago—signed agreements before 2014, and Jeanne Tortorelli—a current employee—signed them from 2014 forward. (*See* Klapp Decl. ¶ 5.)[1]

---

[1] "Bart Decl." refers to the Declaration of Daniel Bart, "Klapp Decl." refers to the Declaration of Louis Klapp, and "Mueller Decl." refers to the Declaration of Gregory Mueller, all filed with this

EIG asserts that Constellation engaged in conduct not permitted by the subscription agreements, and that such activity constituted copyright infringement. (Dkt. 1 ¶ 52.) In particular, EIG now points to so-called authorized users of *NIW* forwarding copies of the publication to unauthorized users and/or saving the copies of *NIW* on a network folder where some of their purportedly unauthorized colleagues could potentially access them. (Mot. at 1.) EIG's claims are faulty because the subscription agreements specifically permitted occasional and non-systematic forwarding of *NIW* and downloading for individual referential use, which is the type of conduct accused in this case. (Dkt. 96 at p.22 ¶¶ 6–7, pp.29–30 ¶¶ 27–29.)

Among other things, Constellation also alleges a defense of statute of limitations. (Dkt. 96 at p.21 ¶¶ 1–2.) In its Complaint, EIG admitted that, through its email delivery vendor (the vendor who emailed Constellation its pdf copies of *NIW* on behalf of EIG), EIG had tracking capabilities to determine the number of unique users who opened the emails that delivered *NIW*. (Dkt. 1 ¶¶ 35–36.) Constellation asserts that, if its conduct was actually infringing, EIG reasonably could have uncovered it years before it filed suit by using this external tracking technology. (Dkt. 96 at p.21 ¶¶ 1–2.) Indeed, the tracking data produced by EIG in discovery shows that EIG gained access to this technology no later than 2015, yet Constellation did not sue until 2020. (*See* Mueller Decl., Ex. 1.) Constellation's affirmative defenses are ***not*** premised on the idea that EIG should have accessed Constellation's ***internal*** network or email servers to monitor Constellation's activity (*see* Dkt. 96 at p.21 ¶¶ 1–2.).

Constellation asserts six counterclaims that relate to EIG's desire for its customers to engage in conduct that EIG can later accuse of copyright infringement. (*See* Dkt. 96 at pp.39–46.)

---

brief. "Ex." refers to the exhibits filed with the Mueller declaration. "Mot." refers to EIG's Motion to Compel (Dkt. 110).

2

This desire explains why EIG purposefully avoided investigating the allegedly infringing conduct before it built up a decade's worth of supposed damages, never canceled any of its subscription agreements with Constellation after it learned of the supposed infringement, entered into new yearly terms for *NIW* after it learned of the supposed infringement, and never bothered to let Constellation know that EIG thought Constellation's conduct was outside the permissible scope of its license. (*See, e.g., id.* pp.33–34 ¶¶ 44–49.)

## II. ARGUMENT

### A. Constellation is not withholding any information responsive to EIG's Interrogatory No. 3.

Constellation is not withholding any information responsive to EIG's Interrogatory No. 3, so there is nothing to compel. Constellation has investigated the interrogatory—it spoke to employees with relevant knowledge and reviewed documents—and it provided the responsive information that it uncovered.

The interrogatory asks to identify the person who "read . . . the terms and conditions of the subscription agreements," and Constellation's answer identifies Jeanne Tortorelli. (Dkt. 101-1 at 4–5.) EIG complains that Constellation's answer says that Ms. Tortorelli "viewed" the agreement rather than "read" the agreement. (Mot. at 4.) If Constellation knew that she reviewed each of the terms in the agreement, or if it knew that she didn't review each of the terms, Constellation would so state. But, it has been almost eight years since Ms. Tortorelli took over responsibility for this subscription. (*See* Klapp Decl. ¶ 5.) Memories fade, and it should not be surprising that the details about her review and signature could be forgotten. Nonetheless, Constellation's investigation found that Ms. Tortorelli at least looked over the agreement's terms before signing the document, and it conveyed that information in its answer to the interrogatory.

3

Additionally, even though the interrogatory did not ask for the information, Constellation supplemented its answer to identify other individuals who had some administrative responsibilities related to the subscription. (Dkt. 101-1 at 5.) This was a good faith attempt to provide information that EIG could use in considering depositions. EIG is free to depose Ms. Tortorelli or other relevant individuals to explore these topics directly.[2]

Constellation satisfied its obligations for EIG's Interrogatory No. 3, and it has nothing else to provide. Constellation recognizes its duty to supplement, and it will promptly provide additional responsive information should any become known.

**B.     The Court should sustain Constellation's objections to EIG's RFP No. 49, as third-party publications are irrelevant to this litigation and the discovery would be overly burdensome.**

Perhaps recognizing the weakness in its own case, EIG now wants to investigate and litigate whether Constellation may have infringed third-party copyrights in third-party publications. This is speculative and irrelevant, inconsistent with Judge Gottschall's prior order in this case, and unduly burdensome, so the Court should sustain Constellation's objections to RFP No. 49.

**1.     EIG has not shown that the documents sought may contain relevant information.**

EIG argues that (1) the requested documents could potentially show that Constellation infringed one or more third-party copyrights and (2) if so, that fact would be relevant to disproving Constellation's counterclaims. (Mot. at 8.) Prong two is wrong because there is no relevance. Regardless, the basis for prong one is pure speculation: EIG does not point to anything even hinting

---

[2] EIG makes several arguments about the relevance of this information to the defenses and counterclaims in this Action. (Mot. at 5–6.) Constellation disputes EIG's position, but the dispute is not pertinent to this motion given that Constellation is not withholding information (based on relevance or otherwise).

that infringement of third-party copyrights occurred. This alone warrants denying EIG's motion to compel.

A party seeking discovery must offer more than mere speculation that requested discovery could reveal relevant evidence. *Sirazi v. Panda Express, Inc.*, No. 08 C 2345, 2009 WL 4232693, at *3–*4 (N.D. Ill. Nov. 24, 2009). In *Sirazi*, the defendant sought discovery on conversations between the plaintiff and his lawyers in other cases, arguing that the plaintiff could have had conversations with the lawyers on topics relevant to the *Sirazi* case given similar subject matter. *Id*. at 3. The court assumed without deciding that the conversations were nonprivileged (waiver was asserted) and instead rejected the discovery requests for lack of relevance. *Id*. In particular, the court agreed that if the hypothetical conversations took place, "they are obviously relevant." *Id*. But, the court held, "there is no basis on the present record for concluding he did or even that he might have [had those conversations]." *Id*. The court put it this way: "without some reason to conclude that the pond might be stocked, one cannot demand to 'fish.'" *Id*.

EIG has not shown that the pond might be stocked. EIG has offered no reason to believe—and there is no reason to believe—that Constellation violated any third-party subscription agreements or third-party copyrights. (Mot. at 7.) For example, as suggested by EIG's motion, Constellation has already produced some documents related to third-party publications (responsive to RFPs not at issue here), including third-party terms and conditions. (*See* Mot. at 7; Klapp Decl. ¶ 4.) EIG does not point to anything suggesting that infringement of third-party copyrights occurred. (*See* Mot. at 7.) EIG simply says that Constellation had other subscriptions and, therefore, Constellation could have possibly infringed these copyrights. (*Id*.) This is outright speculation that does not warrant the requested fishing expedition.

Indeed, Judge Gottschall has already ruled against EIG on a similar issue. EIG sought to amend its Complaint to add allegations that Constellation infringed a different EIG publication called *Uranium Intelligence Weekly* ("*UIW*," a predecessor to *NIW*) from 2008–2011. (Dkt. 73 at 1, 2.) In support of those newly proposed copyright infringement claims, EIG alleged that Exelon's Haksoo Kim—an authorized recipient of *UIW*—impermissibly forwarded copies of *UIW* in the 2008–2011 timeframe, but the allegation was based only "on information and belief." (*Id*. at 2.) The sole well-pleaded facts about Kim were that he ***received*** forwarded copies of *NIW* from Ken Petersen—an authorized user of *NIW*—in 2014 and 2015. (*Id*. at 3.) EIG argued that "Kim must have forwarded copies of *UIW* to other [Constellation] employees three years earlier because he 'participated in infringing activities in 2014 and 2015.'" (*Id*. (quoting EIG's brief).) The Court rejected EIG's argument and denied its motion for leave to amend its Complaint to add these *UIW*-based allegations. (*Id*. at 4.) The Court held that EIG's *UIW*-allegations were mere "speculation," as Kim's receipt of *NIW* in 2014 and 2015 showed nothing about what if anything he did with respect to *UIW* three years earlier. (*See id*.)

EIG's motion to compel should be denied for similar reason. Just as its motion to amend sought to raise hypothetical infringement of *UIW* based solely on accusations of infringement of *NIW*, EIG's motion to compel seeks to raise hypothetical infringement of at least ***five*** third-party publications based solely on accusations of infringement of *NIW*. Just as the *UIW*-based allegations were based on mere speculation, the third-party-publication allegations are likewise based exclusively on speculation. Thus, even if Constellation's purported infringement of third-party copyrights could be deemed relevant to this case (it is not), there is no reason to believe that the documents will show such infringement, so the documents are outside the permissible scope of discovery. Fed. R. Civ. P. 26(b)(1); *Eternal Mart, Inc. v. Nature's Sources, LLC*, No. 1:19-CV-

6

02436, 2019 WL 6052366, at *3 (N.D. Ill. Nov. 15, 2019) (denying requested discovery because "[movant] has not given the Court any reason to believe that the pond might be stocked with fish").

## 2. The discovery would be disproportionate and unduly burdensome.

Assuming for the sake of argument that infringement of third-party publications would be relevant to this case (it would not be) and that EIG has a non-speculative basis to assume the requested discovery would show such infringement (it has not), the Court should still deny the discovery request because "the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(1). EIG's infringement case principally concerns, for each of 450 editions of *NIW* (nine years of a weekly publication), whether and the extent to which such edition was forwarded and/or saved, and the permissible conduct under the relevant yearly subscription agreement. (*See* Section I.) As such, EIG has sought (among other things) documents (1) showing or discussing any sending or receiving of the 450 *NIW*s, (2) showing or discussing any saving of the 450 *NIW*s, (3) about any of the yearly subscription agreements or terms and conditions, and (4) communications between EIG and Constellation about *NIW* or the subscription terms. (*See generally* Dkt. 110-4 (EIG's document requests).) Constellation produced over 3,500 documents representing nearly 26,000 pages, the bulk of which being responsive to one or more of the four preceding categories (for example, just the emails from EIG to Constellation and their attachments account for nearly half of these documents). (Klapp Decl. ¶¶ 2–3.) The process to search for, collect, review, and produce nine years' worth of documents for 450 discreet issues took months. (*Id*.) Given the long timeframe back to 2011, it involved recovering email from an archive. (*Id*. ¶ 2)

EIG wants to increase this work ***fivefold***. While it says, "there are likely only relatively few third-party copyrighted publications at issue," it identifies no less than five publications it

7

wants to baselessly investigate: *Platts Nuclear Fuels*, *Fuel Cycle Week*, TradeTech's *Nuclear Market Review*, NAC International's *Nuclear Fuel Market Issues & Insights*, and Energy Resources International's *Market and Risk Report*. (Mot. at 7.) That is five times the number of publications at issue in this case already, and it invites five times the work already performed for *NIW* (the only publication actually relevant to this case). To be clear, EIG apparently demands the same four buckets of documents discussed in the paragraph above, but for publications with which it has no copyright rights. (*See* Dkt. 110-4 at 24; Mot. at 7–8.) This would be a monumental undertaking for no good reason.

The request is actually much worse. While EIG's **motion** focuses on five example publications, the **request** is not so limited. EIG's examples appear to comprise the publications that may have been used by the team of five or so Constellation employees responsible for purchasing uranium (Constellation employees who subscribed to *NIW* came from this team). But EIG's motion apparently is not limited to these five publications, and the actual document request covers all of Constellation. (Dkt. 110-4 at 24.) Thus, RFP No. 49 asks Constellation about all third-party publications used anywhere within Constellation. Constellation has over 13,000 employees, and it would take an incredible amount of time and effort just to determine the universe of publications covered by the request, let alone to search for, collect, review, and produce associated documents. (*See* Ex. 3 at 22; Klapp Decl. ¶¶ 2–3.)

Thus, because EIG has offered no reason to believe the documents sought would contain relevant information, and the undertaking to produce them would be unduly burdensome, the Court should deny EIG's motion to compel documents responsive to RFP No. 49.

**C.      The Court should sustain Constellation's objections to EIG's RFP No. 41, as Constellation's network security systems are irrelevant to this litigation and disclosure would present a substantial security risk.**

Among other things, Constellation operates nuclear power plants. EIG has no need to learn the details of Constellation's network security systems, and there are myriad reasons why EIG must not have access to this critically sensitive information.

**1.      EIG has not shown that the documents sought may contain relevant information.**

The Court can easily reject EIG's demand, as the information sought has no relevance at all to the claims or defenses in this case. EIG points to Constellation's affirmative defenses of statute of limitations and failure to mitigate damages (Mot. at 8), but those defenses have no connection to Constellation's network security systems. As summarized above, the Constellation personnel who received emailed editions of *NIW* would occasionally forward the edition to a colleague or save it to a network folder where it was accessible to (but not accessed by) colleagues. (*See* Section I.)[3] As Constellation emphasized during the meet and confer process, Constellation's affirmative defenses are not based on the premise that EIG could have accessed Constellation's network or email systems and monitored whether anyone was improperly saving or forwarding too many copies of *NIW*. Instead, Constellation's defense is based on EIG's ***external*** tracking capabilities, and Constellation's network security systems have no relevance to these external capabilities.

EIG admits that it could—and did—track Constellation's conduct notwithstanding lack of access to Constellation's network, and this ability formed the basis for EIG's infringement claim. EIG described these capabilities in its Complaint:

---

[3] Such acts did not constitute copyright infringement in view of the terms of the subscription agreements. (*See* Section I.)

9

> Plaintiffs have analyzed ***data reflecting Defendant's activity <u>on the servers of the third-party email delivery service</u>*** (the "Delivery Service") that delivers NIW to Defendant. Although neither Plaintiffs nor the Delivery Service have ever accessed Defendant's servers or computer systems, various employees of Defendant have downloaded certain information and images contained in the cover email provided with each issue of NIW from the Delivery Service's servers.
>
> The ***data from <u>the Delivery Service's servers</u>*** indicates that the emails delivering NIW were opened multiple times each day, using multiple unique devices. Upon information and belief, Defendant has been copying and distributing copies of the Registered NIW Works to employees of Defendant.

(Dkt. 1 ¶¶ 35–36 (emphasis added).) In other words, this external tracking capability provided by EIG's email vendor allowed EIG to track activity that supposedly shows copyright infringement without having any access to Constellation's internal network. (*See id*.)

Constellation's affirmative defense is based on EIG's external tracking capability, not anything related to Constellation's internal network or network security system. The body of Constellation's affirmative defense specifically references the abovementioned ***external*** data tracking: "Plaintiffs regularly analyzed data reflecting Constellation's activity on the servers of a ***third-party email delivery service***, and yet Plaintiffs did not initiate this action until July 2020." (Dkt. 96 at p.21 ¶ 1 (emphasis added).) The material sought about Constellation's network security systems is totally irrelevant.

### 2. The discovery sought creates a substantial security risk that is not proportional to the needs of the case.

Even assuming the details of Constellation's network security systems could have some hypothetical relevance to the case (they do not), that relevance is far outweighed by the risks presented by disclosure. Discovery must be "proportional to the needs of the case," and its purported relevance must be weighed against "the burden . . . of the proposed discovery." Fed. R. Civ. P. 26(b)(1). Discovery is not proportional to the needs of the case and is overly burdensome

10

when it unreasonably risks adverse consequences of the disclosure. *See Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996) (Rule 26 allows courts to limit discovery "where the burden is not measured in the time or expense required to respond to requested discovery, but lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material"); *U.S. Equal Emp. Opportunity Comm'n v. Akebono Brake Corp.*, No. CV 3:16-3545-CMC-SVH, 2018 WL 1365796, at *6 (D.S.C. Mar. 16, 2018) (limiting discovery in view of "burden on [defendant] related to safety, business disruption, and privacy and confidentiality concerns"); *Gil v. Sanchez*, No. 17CV698-CAB(JMA), 2018 WL 1621519, at *2 (S.D. Cal. Apr. 4, 2018) (denying requests due to "security and safety issues"); *see also John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) (on mandamus, holding that district court's discovery orders "fail to account properly for the significant privacy and confidentiality concerns present in this case"); *Hespe v. City of Chicago*, No. 13 C 7998, 2016 WL 7240754, at *3 (N.D. Ill. Dec. 15, 2016) (discovery not proportional because any possible benefit is "outweighed by plaintiff's privacy and confidentiality interests"). That is the case here. In particular, the information sought concerns the systems that keep intruders out of Constellation's computer network, which is extremely sensitive given Constellation's critical role as a provider of electricity to millions of Americans. As explained further below, if Constellation's network security information is disclosed, the risk of a bad actor gaining that sensitive information from another source (*e.g.,* a law firm) is very real.

Constellation operates the largest fleet of nuclear power plants in the United States and a fleet of natural gas, hydroelectric, wind, and solar assets. (Mueller Decl., Ex. 2.) As a result, Constellation is a target of bad actors seeking to cause harm to the United States or acting for their own financial gain. (Bart Decl. ¶ 3.) In particular, "[t]hreat sources continue to seek to ***exploit potential vulnerabilities in the electric generation and natural gas industry*** associated with

11

protection of sensitive and confidential information, grid infrastructure and other energy infrastructures." (Mueller Decl., Ex. 3 at 38 (emphasis added); *accord* Bart Decl. ¶¶ 3–4.) This is well-known to anyone who follows the news. Just last year, Colonial Pipeline—the largest pipeline system for refined oil products in the United States—suffered a successful cyberattack that caused its pipeline operations to shut down:

> **The New York Times**
>
> **Cyberattack Forces a Shutdown of a Top U.S. Pipeline**
>
> The operator, Colonial Pipeline, said it had halted systems for its 5,500 miles of pipeline after being hit by a ransomware attack.

(Mueller Decl., Ex. 4 at 1.)

Regrettably, this was not an isolated incident. A few weeks ago, "a cyberattack [] forced wind turbine giant Nordex to shut down internal systems." (Mueller Decl., Ex. 5.) Indeed, every day of the year, companies have their operations impacted by cyberattacks of various sorts. (Bart Decl. ¶ 4.) A report from International Business Machines Corp. found that the energy industry was the third most targeted sector for cyberattacks in 2020. (Mueller Decl., Ex. 6 at 2.) "[E]very day, sophisticated state-sponsored actors and criminal hackers are seeking new ways to target critical U.S. infrastructure." (Mueller Decl., Ex. 7 at 1.) The United States government has publicly warned of the significant risk posed by cyberattacks on the U.S. Energy sector. For example, on March 24, 2022, several government agencies issued a joint Cybersecurity Advisory with information on "multiple intrusion campaigns targeting U.S. and international energy sector organizations conducted by indicted Russian state-sponsored cyber actors from 2011 to 2018." (Mueller Decl., Ex. 8 at 1.)

As a significant participant in supplying power in the United States, Constellation is a target of state actors and ransomware groups. (Bart Decl. ¶ 3.) Throughout the day, every day, unscrupulous third parties all over the world are scanning and testing Constellation's systems at all levels. (Bart Decl. ¶ 5.) The attacks and disruptions directed at power companies "are becoming increasingly sophisticated and dynamic" and "advanced digital technologies increase the potentially unfavorable impacts of such attacks." (Mueller Decl., Ex. 3 at 38; *accord* Bart Decl. ¶ 4.) As the U.S. government explained, the war in Ukraine has only increased the risks associated with such activity. (*See* Mueller Decl., Ex. 8 at 2.)

If successful, a cyberattack could have significant ramifications on the operation of Constellation's business. (Bart Decl. ¶¶ 4, 6.) Furthermore, such an attack could directly affect numerous utility companies. (*Id*. ¶ 7.) While Constellation recently spun off from its former parent company, Exelon Corporation, Constellation still shares network resources with Exelon distribution utilities (Atlantic City Electric, Baltimore Gas and Electric, Commonwealth Edison, Delmarva Power & Light, PECO Energy Company, and Potomac Electric Power Company), and will do so for some time. (*See id*.; *see also* Mueller Decl., Ex. 9.) A breach of that network would therefore impact not only Constellation, but Exelon utilities who serve more than 10 million customers (Mueller Decl., Ex. 9.)

To successfully defend itself against cyberattacks, Constellation keeps the details about its network security systems secret. (Bart Decl. ¶ 8.) This secrecy is in and of itself a critical aspect of maintaining network security. (*Id*. ¶ 9.) If bad actors know details about the security infrastructure, they know what, when, or how to attack. (*Id*.) For example, the identity of the firewall technology used by Constellation could be invaluable to attackers. (*Id*.) If they know this

13

information, Constellation could become a victim to a targeted attack against any known vulnerabilities associated with its infrastructure. (*Id.*)

EIG argues that there is a confidentiality order in this case (Mot. at 10), but that misses the point. Once a document is provided to another party, the producing party's control over that information is dramatically limited and the risk of disclosure heightened. *See Goetz*, 531 F.3d at 458 (requested discovery will result in the duplication of confidential information that "implicates significant privacy and confidentiality interests—regardless of whether the imaged media are initially held under seal—and these interests cannot be fully protected ex post."). Constellation is not assuming that EIG or its lawyers at Powley & Gibson intend to launch a cyberattack on Constellation or intentionally pass the information to someone who will. The primary concern is that bad actors could acquire this information from the various places it will be found if Constellation is compelled to produce it.

Law firms are targets of cyberattacks, in large part because they are repositories of sensitive client information. (Mueller Decl., Ex. 10 at 2.) Document productions "can be ripe targets for corporate espionage and data breach as they may contain trade secrets and other proprietary business information." The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 179 n.147 (2018). Indeed, "law firms tend to be more vulnerable than other types of businesses." (Mueller Decl., Ex. 10 at 2.) In October 2020, the American Bar Association found that ***29% of law firms reported a security breach***, and that fails to count the unknown breaches. (Mueller Decl., Ex. 11 at 3.)

The risk of a bad actor gaining sensitive information about Constellation from another source, like third-party law firms, is very real. The Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, the Federal Bureau of Investigation, and the

14

Department of Energy, recently released a report titled, "Tactics, Techniques, and Procedures of Indicted State-Sponsored Russian Cyber Actors Targeting the Energy Sector." (Mueller Decl., Ex. 12.) It noted that, in a recent campaign by actors associated with the Russian government, the actors gained access to its energy-sector targets by first exploiting vulnerabilities from third-party vendors:

> Beginning in 2016, the threat actor began widely targeting U.S. Energy Sector networks. The actor conducted these attacks in two stages: ***first targeting third-party commercial organizations (such as vendors, integrators, and suppliers) and then targeting Energy Sector organizations***. The threat actor used the compromised third-party infrastructure to conduct spearphishing, watering hole, and supply chain attacks ***to harvest Energy Sector credentials and to pivot to Energy Sector enterprise networks***.

(*Id*. at 3 (emphasis added).)

At bottom, the Court can and should reject EIG's request under RFP No. 41 because the documents are irrelevant to the claims and defenses in this action. But even if EIG can establish some relevance, the benefits of production would be far outweighed by the risks presented to Constellation and Exelon, the customers that depend on their services, and the governments that depend on their role in providing a dependable energy infrastructure.

### III. CONCLUSION

For the foregoing reasons, the Court should DENY EIG's motion to compel.

Dated: May 23, 2022

Respectfully submitted,

/s/ Louis A. Klapp
Brian O. Watson
Sondra A. Hemeryck
Louis A. Klapp
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison, Suite 2900
Chicago, Illinois 60602

15

Phone: (312) 471-8700
Fax: (312) 471-8701
bwatson@rshc-law.com
shemeryck@rshc-law.com
lklapp@rshc-law.com

*Attorneys for Defendant and Counterclaim Plaintiff Constellation Energy Generation, LLC*